[No. D044138. Fourth Dist., Div. One. July 13, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
SCOTT C. ANZALONE, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION[1]]**

---

[1] Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of DISCUSSION A. Instruction on Other Crimes Evidence, B. Prosecutorial Misconduct, D.3. Ineffective Assistance During Defense Argument, D.4. Ineffective Assistance During Investigation, and E. Sentencing.

COUNSEL

Jeffrey J. Stuetz, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster, David Delgado-Rucci and Barry J. T. Carlton, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**BENKE, Acting P. J.**—Scott C. Anzalone was convicted of four counts of willful, deliberate and premeditated attempted murder, grossly negligent discharge of a firearm, being a felon in possession of a firearm, being a felon

in possession of ammunition and attempted vehicle theft. As to the attempted murder and firearm discharge offenses, the jury made true findings on various firearm and weapon use allegations. Anzalone was sentenced to a prison term of 42 years six months plus two consecutive life terms. He appeals, arguing instructional error with regard to his defense of alibi, prosecutorial misconduct, instructional error concerning the intent element of attempted murder, ineffective assistance of counsel and sentencing error.

After the filing of the original opinion in this case, our Supreme Court granted review and ordered the case held pending decision in *People v. Smith* (2005) 37 Cal.4th 733 [37 Cal.Rptr.3d 163, 124 P.3d 730]. After deciding *Smith*, the court transferred the matter to this court for reconsideration.

## FACTS

### A. *Prosecution Case*

#### 1. *Newport Avenue*

On July 11, 2002, Che Love, Joe Diez, Kelly McGuire and Paul Foster went surfing. When they finished, Love and Diez drove in Love's car to the home of Pete Krudwig on Newport Avenue in Cardiff to drop off their boards. At approximately 5:30 or 6:00 p.m., Love parked his car in an alley at the Krudwig residence and, since he planned to leave the car unattended for only a moment, left the key in the ignition. After the men took their surfboards to the house, Love returned to the alley to find a man later identified as appellant getting into Love's car.

Love ran to the car as appellant tried to start it. Love struck appellant and was able to switch off the car's ignition and yell for help. As Love wrestled with him, appellant stated that he had mistaken the car for someone else's. Krudwig, McGuire and Diez came to Love's assistance. As appellant was getting out of the car through the passenger side widow, McGuire kicked him in the face. Appellant ran off to the south leaving behind a walkie-talkie and one of his shoes.

As Love, Krudwig, Diez and McGuire discussed what had happened, a silver convertible Mitsubishi Eclipse driven by appellant came down the alley from the south at 15 or 20 miles per hour. As the car drove by, appellant pointed a gun at the men. Someone yelled "gun" and the men dove for cover. As he passed, appellant fired two shots across the passenger seat at the men. The first shot hit Love's car just above his head, the second hit the car's trunk in the area where the other men were attempting to find cover. Diez believed someone was in the passenger seat of the car reclined below the level of the

door. Within one to three minutes after the shots, a call was placed to the sheriff's office. Records indicated the sheriff's office received a call concerning the shooting at 6:06 p.m.

Several months after the shooting, Love, Krudwig and Diez independently viewed a photographic line-up. Each man picked out the photograph of appellant and was 100 percent sure he was the man who attempted to steal Love's car and shot at them. Each of the men identified appellant in court. Love and Krudwig testified the man who attempted to steal Love's car had tattoos on his arms. Appellant has such tattoos.

A month before the shooting incident, on June 4, 2002, a black-over-silver Mitsubishi Eclipse convertible belonging to Patricia Bostrom was stolen from her garage in Bonita. Karl Fousek, manager of Rancho San Diego Self-Storage, a storage facility in Spring Valley, saw appellant, whom he knew, driving a black-over-silver Mitsubishi Eclipse convertible to the storage facility about three times a week between September and December 2002.

On December 16, 2002, appellant and another person were arrested at Rancho San Diego Self-Storage. The other person was driving Patricia Bostrom's Mitsubishi Eclipse.

Love, Krudwig and Diez testified that Bostrom's Eclipse convertible looked very much like the car from which shots were fired at them.

### 2. *Requeza Street*

At approximately 5:30 p.m., on the day of the Newport Avenue shooting, Sarah Hagaman, the manager of an apartment complex on Requeza Street in Encinitas, saw a man standing by a truck belonging to one of her tenants, Charles Manna. The truck's door was open. The man standing by the truck smiled and waved at her. The man disappeared but shortly returned as the passenger in a small sports car. The man got into Manna's truck and the two vehicles departed quickly.

Hagaman went to Manna's apartment and told him what had occurred. Manna had given no one permission to take his truck. Manna, who was recovering from surgery, went downstairs, saw his truck was missing, walked back upstairs to his apartment, called the police and reported the theft. The call was received by the sheriff's office at 6:09 p.m.

Hagaman was shown a photograph of Bostrom's Eclipse and testified it looked similar to the sports car in which the man who took Manna's truck

was riding. Hagaman testified that appellant looked like the man who drove off in Manna's truck. After seeing appellant smile in court, she was almost certain he was the man.

It is 2.5 miles from the apartment building where Manna's truck was taken to the location of the shooting near Newport Avenue. Driving at a legal speed, the distance can be covered in five minutes.

### B. *Defense Case*

Appellant's defense was alibi. He claimed he could not have attempted to steal Love's car or fire shots at Love and his friends because at that time he was stealing Manna's truck. Appellant's sister Brandi Harris testified that in July 2002 appellant was living with her. Harris testified that at some point while he was living with her, appellant brought home tools. Manna identified those tools as coming from his truck. Harris testified that in July 2002 appellant had an injured knee and could not run.

Harris testified appellant wore smaller shoes than the one left at the shooting site. At trial, appellant tried on the shoe. His big toe came to one to one and one-half inches from the tip of the shoe.

### DISCUSSION

#### A.–B.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### C. *Concurrent Intent*

Appellant argues that three of his four convictions for attempted murder should be reversed. Citing *People v. Bland* (2002) 28 Cal.4th 313 [121 Cal.Rptr.2d 546, 48 P.3d 1107] (*Bland*), he argues the trial court erred when it failed sua sponte to instruct that in order to find him guilty of a count of attempted murder, it was necessary the jury find that he had the specific intent to kill the person named as the victim in that count. Appellant argues this error was exacerbated when in argument the prosecutor told the jury it was unnecessary to find such intent if the named victim was in the "zone of danger" created when appellant fired gunshots indiscriminately at a group of people.

As noted, after the filing of the original opinion in this case, our Supreme Court granted review and ordered the case held pending decision in *People v.*

---

*See footnote, *ante*, page 380.

*Smith, supra,* 37 Cal.4th 733. After deciding *Smith,* the court transferred the matter to this court for reconsideration.

### 1. *Law*

■ "The crime of attempt occurs when there is a specific intent to commit a crime and a direct but ineffectual act done towards its commission. [Citation.] ' "An attempt connotes the intent to accomplish its object, both in law . . . and in ordinary language." [Citation.]' [Citation.] The act required must be more than mere preparation, it must show that the perpetrator is putting his or her plan into action. That act need not, however, be the last proximate or ultimate step toward commission of the crime. [Citation.] Where the intent to commit the crime is clearly shown, an act done toward the commission of the crime may be sufficient for an attempt even though that same act would be insufficient if the intent is not as clearly shown. [Citation.]" (*People v. Bonner* (2000) 80 Cal.App.4th 759, 764 [95 Cal.Rptr.2d 642]; see also 1 Witkin & Epstein, Cal. Criminal Law, Elements (3d ed. 2000) §§ 54, 58–60, pp. 263–264, 266–269.)

■ As noted, an attempt can occur even though the ultimate step toward commission of the intended crime never occurs. (See *People v. Bonner, supra,* 80 Cal.App.4th at pp. 764–767 [two attempted robberies occurred even though defendant never came in contact with victims]; *People v. Morales* (1992) 5 Cal.App.4th 917, 925–927 [7 Cal.Rptr.2d 358] [attempted murder occurred even though no shot was fired].)

In *Bland* the defendant was a gang member. Wilson, a member of another gang, and Morgan and Simon, apparently not gang members, drove up to Bland and a companion. Bland approached Wilson, who was driving, spoke to Wilson and then started shooting into the vehicle. As Wilson drove off, Bland and his companion fired at the car. The car crashed. Wilson died. Morgan and Simon were badly wounded. It was impossible to determine who fired the shots that hit Morgan and Simon. Bland was convicted of the murder of Wilson and two counts of attempted premeditated murder as to Morgan and Simon. (*Bland, supra,* 28 Cal.4th at p. 318.)

The prosecutor's theory was that Bland could be convicted of attempted murder based either on the finding that he intended to kill Morgan and Simon or on a transferred intent theory, i.e., even if Bland did not intend to kill the two men, his intent to kill Wilson carried over or transferred to the, perhaps, inadvertent wounding of Morgan and Simon. (*Bland, supra,* 28 Cal.4th at p. 319.)

■ The Supreme Court noted it was possible, given the evidence, that Bland killed his intended victim and that the other two men were wounded

unintentionally. The court concluded that while the intent to kill one person transfers to the unintended killing of others, the intent to kill does not transfer to victims who are not killed and, thus, cannot be a basis for a finding of attempted murder. (*Bland, supra,* 28 Cal.4th at pp. 326–331.)

■ The court cited with approval this summary of the rule: " '[W]here a single act is alleged to be an attempt on two persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another.' [Citation.]" (*Bland, supra,* 28 Cal.4th at p. 327.) The court noted that a necessary element of attempted murder, unlike murder, is the intent to kill. The court stated: "To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Id.* at p. 328.)

■ The court stated, however, that one who fires at a group of people desiring the death of a target, nonetheless, can be convicted of the attempted murder of the nontargeted persons if " 'the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. . . .' " (*Bland, supra,* 28 Cal.4th at pp. 329–330.) The court gave as examples placing a bomb in an airliner when the desire is to kill a particular person on board, firing an automatic weapon at a group of people on the street motivated by the desire to kill one particular person in the group or the use of an explosive device devastating enough to kill everyone in the group. The court describes this as the creation of a "kill zone." (*Id.* at p. 330.)

■ Quoting with approval *Ford v. State* (1992) 330 Md. 682 [625 A.2d 984, 1000–1001], *Bland* states: " 'When the defendant escalate[s] his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the fact finder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death. The defendant's intent need not be transferred from A to B, because although the defendant's goal was to kill A, his intent to kill B was also direct; it was concurrent with his intent to kill A. Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone. This situation is distinct from the "depraved heart" [i.e., implied malice] situation because the trier of fact may infer the actual intent to kill which is lacking in a "depraved heart" [implied malice] scenario.' [Citation.]" (*Bland, supra,* 28 Cal.4th at p. 330.)

*Bland* concluded that the evidence "virtually compelled" a finding that, even if defendant primarily wanted to kill Wilson, he also, concurrently, intended to kill the others in the car. The court stated that Wilson at least "intended to create a kill zone." (*Bland, supra,* 28 Cal.4th at p. 333.)

In *People v. Smith, supra,* 37 Cal.4th 733, the court again visited the issue of attempted murder. In *Smith,* Karen A. was sitting in the driver's seat of her car. Her baby was sitting in an infant seat directly behind her. Smith approached Karen's car. The two had an acrimonious relationship. As Karen started to drive away, she looked in the rearview mirror and saw appellant directly behind her holding a gun. Appellant fired a single shot that barely missed both Karen and her baby. Convicted of two counts of attempted murder, Smith argued while the evidence was sufficient to convict him of attempting to murder Karen, it was insufficient to convict him of attempting to murder the baby. (*Id.* at pp. 736–738.)

In resolving Smith's claim, the court noted that attempted murder requires a finding that the defendant harbored express malice toward the victim, i.e., the defendant either desired the victim's death or knew to a "substantial certainty" that the victim's death would occur. (*Smith, supra,* 37 Cal.4th at pp. 739, 743.) The court observed that the jury in *Smith* was properly instructed on the elements of attempted murder, including the requirement that defendant be found to have acted with the specific intent to kill the baby in order to be convicted of attempted murder of the child. (*Id.* at p. 740.) The court concluded that the evidence in the case supported the conclusion that when Smith fired into the car he intended to kill both Karen and her baby. (*Id.* at pp. 743–745.)

As part of its discussion the court in *Smith* dealt with a defense claim that the only theory on which a conviction of attempted murder as to the baby could be based was the "kill zone" theory announced in *Bland.* Appellant argued the facts did not support conviction on that theory because Smith did not use a bomb, other explosive device or a hail of bullets. Smith noted he fired a single shot. (*Smith, supra,* 37 Cal.4th at p. 745.)

The court rejected Smith's analysis. It stated the existence of the kill zone theory did not preclude a conclusion that Smith's act of firing a single shot at Karen and her baby, both of whom were in the direct line of fire, was an attempted murder of both. The court described the kill zone theory, i.e., the use of lethal force intended to kill everyone in an area around the targeted victim as a means of killing the targeted victim. The court noted that the kill zone theory was not the sole basis on which multiple convictions of attempted murder could be supported. The court stated in circumstances like those in *Smith,* multiple attempted murder convictions could be based on the

simple conclusion that Smith intended to kill both Karen and her baby. (*Smith, supra,* 37 Cal.4th at pp. 745–746.)[2]

### 2.  *Background*

Here, Love caught appellant attempting to steal his car. A struggle ensued. Love yelled for his friends Krudwig, McGuire and Diez. The men joined in the fight. As appellant came out the passenger window of the car, McGuire kicked him in the face. Appellant escaped. As the four men talked about what occurred, a car driven by appellant came quickly towards them. As appellant drove past, one of the men yelled "gun." Love dove toward the front of the car the other three men went to the back. Appellant fired two shots, one in the direction of Love and the other in the direction of the other men.

Appellant was charged with four counts of attempted murder.

Using standard CALJIC instructions, the trial court told the jury that an attempted murder occurs when there is a "direct but ineffectual act by one person towards killing another human being; and . . . the person committing the act harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."

The court instructed the jury that it was alleged as to each of the four counts of attempted murder that the crimes attempted were willful, deliberate and premeditated murder. The court defined the terms and then told the jury that if the attempted murder was preceded by a clear deliberate intent to kill as the result of deliberation and premeditation and not a sudden heat of passion it was an attempt to commit willful, deliberate and premeditated murder.

The court explained the difference between mere preparation and the actual commencement of the criminal act. The court instructed that to amount to an attempt, "[t]he acts must be an immediate step in the present execution of the killing, the progress of which would be completed unless interrupted by some circumstances not intended in the original design."

The trial court did not instruct concerning the doctrine of transferred intent. Nor did the court instruct in the terms of CALJIC No. 8.66.1, concerning the concept of concurrent intent. At the time of the trial in this case, CALJIC No. 8.66.1 [Attempted Murder—Concurrent Intent] stated: "A person who

---

[2] In this regard the court stated: "We thus have no occasion here to decide under what factual circumstances, if any, the firing of a single bullet might give rise to multiple convictions of attempted murder under *Bland*'s kill zone rationale." (*Smith, supra,* 37 Cal.4th at p. 746, fn. 3.)

primarily intends to kill one person, may also concurrently intend to kill other persons within a particular zone of risk. This zone of risk is termed the 'kill zone.' The intent is concurrent when the nature and scope of the attack, while directed at a primary victim, are such that it is reasonable to infer the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.

"Whether a perpetrator actually intended to kill the victim, either as a primary target or as someone within a 'kill zone' is an issue to be decided by you."

In opening argument, the prosecutor stated: "Okay, we have four counts of attempted murder and we have got four guys in the alley kind of makes sense. But there is [sic] only two gunshots. How do we get the four counts on the two gunshots? Here is the way the law says it is. Something called the zone of danger. Anytime someone is within the zone of danger, whether it be one, two, three or twenty people, somebody indiscriminately shoots towards a crowd of people, everything in that zone of danger qualifies. That is how you can get three counts of attempted murder based on the gunshot at the bumper of the car. You have got Pete Krudwig, Joe Diez and Kelly McGuire in that zone of danger created by the bullet fired down range of them. Separate zone of danger is up by Che Love when he is a little closer to the front of the car. That is how we get to the four counts of attempted murder."

The prosecutor also argued based on the direction of the shots and how close they came to the men that he intended to kill them and not simply damage Love's car out of revenge.

Defense counsel made no argument concerning the elements of attempted murder and confined his remarks to the issues of alibi and misidentification.

Appellant was found guilty of four counts of attempted murder and it was found true that the offenses were willful, deliberate and premeditated.

### 3. *Discussion*

Appellant argues the trial court erred in failing to instruct concerning an essential element of the crime of attempted murder. Appellant contends the trial court was required to instruct it was necessary the jury find that as to *each* victim the defendant harbored the specific intent to kill. Appellant states that without such an instruction the jury could erroneously convict him of three of the four attempted murder counts on a transferred intent theory.

There was no error in the manner in which the trial court instructed concerning the elements of attempted murder. It was made clear to the jury

that appellant was charged with the attempted murder of four separate individuals. The court fully instructed concerning the elements of attempted murder, including that an element of that crime is that the defendant harbored the specific intent to unlawfully kill another human being. The jury was not instructed it could find appellant guilty of the attempted murder of one person based on a finding that he intended to kill a different person. The instructions given by the trial court were correct and unambiguous. While a trial court might amplify the instructions by telling the jury it was necessary it find the required intent as to each victim, it is not required to do so.

This conclusion, however, does not end the inquiry. While the instructions given by the trial court were correct, the argument of the prosecutor concerning how the jury could find appellant guilty of four counts of attempted murder when only two shots were fired was legally incorrect.

It appears the prosecutor was attempting to invoke in some form the concept of concurrent intent outlined in *Bland* to explain how four counts of attempted murder could arise from the firing of only two shots. Undoubtedly, the trial court was aware this was the prosecutor's theory. We cannot be sure since the instructions conference was not recorded. The trial court, however, did not give CALJIC No. 8.66.1, defining the concept of concurrent intent. Again, we cannot be sure why the trial court did not so instruct but it may be because in *Bland* the court explained that concurrent intent is not a legal doctrine requiring special instructions. The concept is, simply, an inference the jury may draw from the evidence. (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6.)

The danger in the trial court not instructing on a legal concept relied on by the prosecution is that it totally leaves to the prosecutor the defining of that legal concept. In this case the prosecutor got it wrong.

The prosecutor told the jury that two shots could amount to four attempted murders because of "something called the zone of danger." The prosecutor explained that anytime persons are within this zone, the indiscriminate firing of a shot at those persons amounts to an attempted murder of everyone in the group. The prosecutor did not explain what constitutes a "zone of danger" or how such a zone relates to the element of intent. He did not tell the jury that the zone is defined by the nature and the scope of the attack and that the attack must reasonably allow the inference that defendant intended to kill some primary victim by killing everyone in that primary victim's vicinity.

■ Contrary to the prosecutor's argument, an attempted murder is not committed as to all persons in a group simply because a gunshot is fired indiscriminately at them. The prosecutor's argument incorrectly suggests that

a defendant may be found guilty of the attempted murder of someone he does not intend to kill simply because the victim is in some undefined zone of danger. In fact, to be found guilty of attempted murder, the defendant must either have intended to kill a particular individual or individuals or the nature of his attack must be such that it is reasonable to infer that the defendant intended to kill everyone in a particular location as the means to some other end, e.g., killing some particular person.

The prosecutor's argument concerning zone of danger was erroneous and misleading.

▮ Thus, while we conclude that the trial court did not err in the manner in which it instructed the jury concerning attempted murder, we do conclude the prosecutor committed error when he misstated the law relevant to the definition of attempted murder. However, no objection was interposed to that misstatement and the issue of prosecutorial error is waived. (*People v. Valdez* (2004) 32 Cal.4th 73, 122 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Morales* (2001) 25 Cal.4th 34 [104 Cal.Rptr.2d 582, 18 P.3d 11]; see *id.* at p. 50 (conc. & dis. opn. of Kennard, J.).)

We will deal with the issue of the prosecutor misstatement of the law again in the context of appellant's claim of ineffective assistance.

### D.  *Ineffective Assistance of Counsel*

Appellant argues defense counsel provided ineffective assistance during the argument and instruction stages of trial when he allowed the defense to be burdened with establishing its alibi defense by a preponderance of the evidence (discussed in a nonpublished portion of this opn.), failed to object to prosecutorial misconduct during argument (discussed in a nonpublished portion of this opn. & part  C., *ante*) and during defense argument misstated facts to the detriment of appellant's case. Appellant also argues counsel provided ineffective assistance in failing to adequately investigate the case and in failing to disclose his personal knowledge of a prosecution witness.

### 1.  *Law*

▮ "To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defense. [Citations.] Counsel's performance was deficient if the representation fell below an objective standard of reasonableness under prevailing professional norms. [Citation.] Prejudice exists where there is a reasonable probability that, but for counsel's

errors, the result of the proceeding would have been different. [Citation.]" (*People v. Benavides* (2005) 35 Cal.4th 69, 92–93 [24 Cal.Rptr.3d 507, 105 P.3d 1099].)

■ It is the defendant's burden to demonstrate the inadequacy of trial counsel. We defer to counsel's reasonable tactical decisions and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Defendant's burden is difficult to carry on direct appeal. We reverse on the ground of inadequate assistance on appeal only if the record affirmatively discloses no rational tactical purpose for counsel's act or omission. (*People v. Lucas* (1995) 12 Cal.4th 415, 436–437 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

■ "Competent counsel is not required to make all conceivable motions or to leave an exhaustive paper trail for the sake of the record. Rather, competent counsel should realistically examine the case, the evidence, and the issues, and pursue those avenues of defense that, to their best and reasonable professional judgment, seem appropriate under the circumstances. [Citation.]" (*People v. Freeman* (1994) 8 Cal.4th 450, 509 [34 Cal.Rptr.2d 558, 882 P.2d 249].)

2. *Ineffective Assistance During Argument and Instruction to the Jury*

a. *Alibi Defense*

Appellant argues counsel provided ineffective assistance when he allowed his case to be burdened with establishing an alibi by a preponderance of the evidence. In a nonpublished portion of this opinion we conclude the defense case was not so burdened.

b. *Appellant's Shoes*

Appellant argues defense counsel provided ineffective assistance when he failed to object to comments by the prosecutor during argument suggesting that the reason the shoe found at the scene was not appellant's size was that appellant was an admitted thief, had probably stolen the shoes and that thieves cannot always get the exact items they need. (Discussed in a nonpublished portion of this opn.)

■ Attorneys are not required to make every conceivable objection. Litigation is a series of tactical choices about which there are no absolute

rules. In this instance counsel may have concluded that since appellant was an admitted thief, little harm was done by the prosecutor calling him one. It might even have been helpful given that his defense was based in large part on the jury believing appellant was committing a car theft at the time of the shooting. Counsel might have believed that the prosecutor's argument that appellant lost his shoe because he was unable to steal one that fit was not particularly convincing and tended to support rather than harm the defense case. Counsel could reasonably have decided it was better to let the comment stand than risk irritating the jury by objecting.

### c. Concurrent Intent

Appellant argues defense counsel provided ineffective assistance when he failed to object to the prosecutor's misstatement of the law related to the concept of concurrent intent. We have concluded the prosecutor committed error with his erroneous comments concerning that concept. (See pt. C. *ante*.) We now conclude defense counsel was prejudicially ineffective in failing to object to the prosecutor's misstatements of the law as to three of the attempted murder counts.

It is true that from the defense prospective, this case had little to do with arcane concepts of concurrent intent. The defense case was about alibi and the quality of the victims' eyewitness identifications. Defense counsel spent his whole argument developing those issues and did not mention the law of attempted murder at all. While this may have been reasonable, the failure to object to the prosecutor's misstatement of the law, an argument that allowed the jury to find appellant guilty of multiple counts of attempted murder on an erroneous legal theory, was not. It was a very real possibility that the jury would reject the defense of alibi and conclude that appellant was the shooter. If the jury so found then the law of concurrent intent, given the nature of the shooting, took on great importance. Counsel should have objected to the prosecutor's misstatements of the law and in failing to do so provided ineffective assistance.

We conclude that had counsel objected there is a reasonable probability the results of the proceeding would have been different. The prosecutor left the jury with the mistaken impression that by firing indiscriminately in the direction of a group of men, appellant was guilty of attempting to kill them all. This greatly lessened the People's burden of proof. Given the nature of the shooting, had the prosecutor's misstatement of the law been corrected after an objection, it is reasonably probable the jury would not have found appellant guilty of all four counts of attempted murder.

The jury was repeatedly instructed by the trial court that to find appellant guilty of deliberated and premeditated murder it was necessary it find he intended to kill. It would not have been reasonable, therefore, for the jury to conclude that the prosecutor's argument concerning "zone of dangers" and indiscriminate firing negated the requirement that a deliberate and premeditated intent to kill be found in order to find attempted deliberate and premeditated murder. The prosecutor couched his argument in terms of how appellant could be found guilty of four counts of attempted murder when only two shots were fired. Taking the court's proper instructions and the prosecutor's erroneous argument together, the jury would have reasonably understood that to find attempted murder it was required to find appellant intended to kill at least one of the men standing by the car; but once it did so, it could find appellant guilty of three additional counts of attempted murder simply because the other victims were in the "zone of danger."

The confrontation in this case began when Love interrupted appellant as he attempted to steal Love's car. The two men fought. Love hit appellant and the two wrestled. When appellant later drove by and fired at the men, one of the shots was not only in Love's direction but barely missed his head. The jury could reasonably find appellant fired intending to kill to Love. The prosecutor's erroneous argument concerning "zone of danger" could have no effect on this calculation. However, it is reasonably probable that having so found, the prosecutor's misstatement concerning the law led the jury to convict appellant of three additional counts of attempted murder merely because the remaining victims were in some "zone of danger."

Defense counsel's failure to object allowed this to occur. His failure amounts to prejudicial ineffective assistance as to the attempted murder convictions in counts 2 through 4. Those counts are reversed.

Pursuant to the direction of our Supreme Court, we have reconsidered this conclusion in light of *People v. Smith, supra,* 37 Cal.4th 733, and find nothing in that opinion contrary to our result.

D.3.–E.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[*]See footnote, *ante,* page 380.

## DISPOSITION

The judgment as to counts 2 through 4 is reversed. The judgment is affirmed as to all other counts.

Huffman, J., and McDonald, J., concurred.

A petition for a rehearing was denied August 14, 2006, and the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied October 25, 2006, S145866.