73 Cal.Rptr.3d 180 (2008)
160 Cal.App.4th 937
The PEOPLE, Plaintiff and Respondent,
v.
Nicholas Scott STONE, Defendant and Appellant.
No. F051812.
Court of Appeal of California, Fifth District.
March 4, 2008.
Patricia L. Watkins, under appointment by the Court of Appeal, for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant *181 Attorney General, David A. Rhodes and Clayton S. Tanaka, Deputy Attorneys General, for Plaintiff and Respondent.
Certified for Partial Publication.[*]

OPINION
DAWSON, J.
Nicholas Scott Stone (appellant) was convicted by jury of one count of attempted murder with premeditation and deliberation (Pen.Code, §§ 664, 187, subd. (a)) and three counts of attempting to dissuade a witness (§ 136.1, subd. (a)(2)). A personal use of a firearm allegation was found true (§ 12022.53, subd. (b)) as to the attempted murder charge, as was an allegation that all counts were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b).) The jury acquitted appellant of one count of possession of a weapon, i.e., a billy club (§ 12020, subd. (a)(1)). Pursuant to the trial court's instructions, when the jury found appellant guilty on count 1, it entered no verdict on count 2, which charged assault with a firearm as an alternative and lesser offense to the attempted murder charged in count 1.
The trial court sentenced appellant to an indeterminate prison term of 15 years to life plus a determinate term of 10 years on the attempted murder conviction with gang and firearm enhancements and to three consecutive seven years to life terms on the convictions for attempting to dissuade witnesses with the gang enhancement.
Appellant contends that the trial court incorrectly instructed the jury on attempted murder, that the prosecutor misstated the law on that subject during argument, and that the evidence is insufficient to support his attempted murder conviction. We agree and will reverse. We publish part of this opinion to address application of the so-called "kill zone" instruction on attempted murder.

FACTS
At approximately 8:30 p.m. on the evening of October 21, 2005, police officers Mark Pescatore, Jeffrey McCabe, and Sergeant Pat Jerrold were on duty at a parking lot carnival when Officer Pescatore noticed a group of 10 to 25 youths blocking the pathways and moving about the carnival area. About half of those in the group were wearing red, a color associated with Norteno street gangs. It appeared to Officer McCabe that the group was "looking for trouble." Sixteen-year-old Joel F., as well as Gerardo A. and "Jamal," were included in the group; both Gerardo and Jamal were members of a Norteno street gang.
Sixteen-year-old Camilo M. also was at the carnival, with his friend Abel Rincon. Camilo was a member of a Sureno street gang. Several members of the Norteno gang called Camilo "scrapa," a derogatory term for a Sureno, and challenged him and Rincon to a fight. Camilo and Rincon decided not to fight and, as they left the carnival, a group of Nortenos followed them into the parking lot. Jamal kicked Rincon's truck as Camilo and Rincon drove away.
Camilo and Rincon went back to where they lived, contacted several people including appellant, and told them what had occurred at the carnival. Camilo and appellant were "good friends." About a half-hour to an hour after the original encounter at the carnival, Camilo and Rincon, along with Julio L., Roselynn M., Pedro Gomez, and appellant, returned to the carnival in Rincon's truck. Camilo and the others armed themselves with "metal pipes," because "[the Nortenos] hit the truck." Rincon drove, while Gomez sat in the center and appellant on the passenger *182 side of the front seat. The others sat in the bed of the truck.
Meanwhile, at the carnival, the officers directed the Norteno group to leave, and about 10 of them went to a grassy area in the parking lot. When Rincon and his companions arrived back at the carnival, he drove his truck by the group of Nortenos and the two groups "mad dogged" each other. Rincon drove past the Nortenos twice and, on the third time, stopped the truck 10 to 15 feet from the group. Rincon held up three fingers, denoting a gang sign; appellant rolled down his passenger window and was "throwing fingers out and he said 13." Appellant then pulled out a gun, which he fired "immediately," and the truck left the scene.
Joel F., who was named as the attempted murder victim in count 1, testified for the prosecution at trial. On direct examination, Joel described the position of the gun in appellant's hand as "pointed up" "slightly" and extended toward the group when he fired. Joel did not think appellant had pointed the gun at anyone in particular, but he acknowledged that when the gun fired, he "ducked behind the car" because he was worried about being shot. The group "scattered" and "[[e]veryone kind of ducked." Joel was "more to the back" of the truck at the time of the shooting.
On cross-examination, when defense counsel asked Joel if the weapon had been pointed at him, he said, "not directly," but it was "near me." When reminded that he had been near the back of the truck at the time, Joel stated the gun "was pointing behind," and even if he was at the back of the truck, "[t]hat's still near me."
On redirect, the prosecutor asked Joel whether he remembered telling an officer at the scene that the gun was pointed just over their heads but low enough that someone could, have been shot. Joel replied, "Just to scare us. I don't really think he was trying to shoot anybody."
Officer Pescatore, who was 60 feet from the truck at the time, observed "an arm come out of the passenger window, and then saw a muzzle flash and heard a gunshot." He described the arm as "pointing straight out the window" at a group of individuals on the grassy island of the parking lot, about four to five feet away.
Officer McCabe, who was standing by Officer Pescatore, also heard the gunshot, and the two followed the truckMcCabe on foot and Pescatore in his patrol caras it headed out of the parking area. Pescatore soon stopped the truck and ordered the six occupants out of the truck one at a time. As appellant backed toward the officer, he whispered to Roselynn, Camilo, and Julio, "If one of you guys rat on me like I'll make sure when I get out I'll kill you guys. If not, I'll send someone to kill you."
Investigator Steven Rossi testified that he spoke to Joel F. in the parking lot after the incident and then took him to the police station. Joel was not able to identify appellant as the shooter, but he told Rossi an hour or so after the shooting that "he just got shot at and he was scared, and that's why he ducked behind the car because he feared for his life, that he was going to get shot." Rossi described Joel as visibly shaken.

DISCUSSION

1. The trial court erred in instructing with the "kill-zone" paragraph of CALCRIM No. 600.

A. People v. Bland and the "kill zone" theory of concurrent intent to kill
Appellant was charged in count 1 with the attempted murder of Joel F. Appellant *183 contends the trial court's instruction on attempted murder misstated the law, because it suggested that the jury could find the requisite specific intent to kill Joel F. by virtue of finding that Joel F. was in a kill zone when appellant fired the gun. He contends that the instruction was both erroneously worded and inapplicable to the facts of this case. We agree with both contentions.
The trial court instructed the jury with a modified version of the so-called kill zone paragraph of CALCRIM No. 600. (See People v. Bland (2002) 28 Cal.4th 313, 331, 121 Cal.Rptr.2d 546, 48 P.3d 1107 [using the term "kill zone" in discussing concurrent intent]; Judicial Council of Cal., Crim. Jury Instns. (2007-2008) Bench Notes to CALCRIM No. 600, pp. 426-427.)
The instruction given here read in part as follows:
"A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or ... `kill zone'.... [¶] In order to convict [appellant] of the attempted murder of [Joel F.], the People must prove either that [appellant] intended to kill [Joel F.], or that he not only intended to kill another human being, but also that he intended to kill anyone within the `kill zone', and that [Joel F.] was in the zone of harm or `kill zone' at the time of the shot. [¶] If you have a reasonable doubt whether [appellant] intended to kill [Joel F.] or intended to kill another by harming everyone in the `kill zone,' or whether [Joel F.] was in the `kill zone,' then you must find [appellant] not guilty of the attempted murder of [Joel F.]"
The standard CALCRIM instruction from which this instruction was taken stems from the California Supreme Court's opinion in People v. Bland, supra, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107.[1] There, after noting that the crime of attempted murder requires proof of a specific intent to kill (Bland, at pp. 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 1107), the high court held that the doctrine of transferred intent has no place in the law of attempted murder.
"`[W]here a single act is alleged to be an attempt on two [or more] persons' lives, the intent to kill should be evaluated independently as to each victim, and the jury should not be instructed to transfer intent from one to another.' [Citation.] [¶] ... [¶] ... To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." *184 (People v. Bland, supra, at pp. 327-328, 121 Cal.Rptr.2d 546, 48 P.3d 11.07.)
The defendant in Bland was convicted of murdering a member of a rival gang he had targeted specifically and of attempting to murder two other persons who had been passengers in the murder victim's car when the defendant showered the vehicle with a barrage of bullets. (People v. Bland, supra, 28 Cal.4th at p. 318, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) The court rejected the use of transferred intent to support the defendant's convictions on the two attempted murder counts. That did not mean, however, that the defendant was not guilty of those crimes. While the defendant could not be found guilty of attempting to kill the two nontargeted victims based on the transfer to them of his intent to kill the targeted murder victim, he could be found guilty of the attempts based on a theory of concurrent intent:
"Even if the jury found that defendant primarily wanted to kill [the murder victim] rather than [the murder victim's] passengers, it could reasonably also have found a concurrent intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (People v. Bland supra, 28 Cal.4th at pp. 330-331, 121 Cal. Rptr.2d 546, 48 P.3d 1107, fn. omitted.)
The court explained that the finding of concurrent intent to kill would be based upon evidence showing that the defendant ensured the death of his targeted victim by employing a means to kill that would result in the death of everyone within the kill zone occupied by the targeted victim:
"The conclusion that transferred intent does not apply to attempted murder still permits a person who shoots at a group of people to be punished for the actions towards everyone in the group even if that person primarily targeted only one of them. As to the nontargeted members of the group, the defendant might be guilty of crimes such as assault with a deadly weapon or firing at an occupied vehicle. [Citation.] More importantly, the person might still be guilty of attempted murder of everyone in the group, although not on a transferred intent theory.... [¶] [Although the intent to kill a primary target does not transfer to a survivor, the fact the person desires to kill a particular target does not preclude finding that the person also, concurrently, intended to kill others within what [another court has] termed the `kill zone.' The intent is concurrent ... when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity.'" (People v. Bland, supra, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
Finally, the court noted that "[t]his concurrent intent theory is not a legal doctrine requiring special jury instructions, as is the doctrine of transferred intent. Rather, it is simply a reasonable inference the jury may draw in a given case: a primary intent to kill a specific target does not rule out a concurrent intent to kill others." (People v. Bland, supra, 28 Cal.4th at p. 331, fn. 6, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) Thus, a defendant may be found to have had the intent to kill multiple victims when, in the effort to kill a targeted victim, he or she employs means that create a zone of danger, and the factfinder can reasonably infer that the defendant intended to kill all *185 persons within that zone. (Id. at p. 330, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
Respondent in the present case tacitly agrees with appellant that the kill zone instruction was inappropriate here. We also agree. There was no evidence here that appellant used a means to kill the named victim, Joel F., that inevitably would result in the death of other victims within a zone of danger. Appellant was charged only with the attempted murder of Joel F. and not with the attempted murder of others in the group on which appellant fired his gun.
Respondent argues that giving the kill zone instruction was harmless because the jury could not have understood it to apply to Joel F., the only victim named in the charge. Respondent, however, ignores two factors we must consider: the trial court's modification of the kill zone instruction and the prosecutor's arguments to the jury. We first address the modification.

B. The modification of the kill zone instruction
By means of redaction, we demonstrate the potential meaning of the trial court's modified kill zone instruction. We remove the first and the last sentences of the instruction, leaving the following:
"In order to convict [appellant] of the attempted murder of [Joel F.], the People must prove either that [appellant] intended to kill [Joel F.], or that he not only intended to kill another human being, but also that he intended to kill anyone within the `kill zone', and that [Joel F.] was in the zone of harm or `kill zone' at the time of the shot."
By doing so, we discover that the trial court did instruct that a specific intent to kill Joel F. could be inferred from evidence that appellant intended to kill someone within the kill zone and that Joel F. was within, that zone. In that sense, the trial court did, as appellant asserts, equate proof of a specific intent to kill with a showing of Joel F.'s presence within a kill zone created by appellant.
In its very recent opinion in People v. Campos (2007) 156 Cal.App.4th 1228, 67 Cal.Rptr.3d 904, the Second Appellate District noted the ambiguity in the standard CALCRIM No. 600 "kill zone" instruction. (Campos, at p. 1243, 67 Cal. Rptr.3d 904.) While the concluding sentence of the instruction refers to an intent to kill "everyone in the kill zone," the preceding sentence speaks of an intent "to kill anyone within the kill zone."[2] "`If a jury instruction is ambiguous, we inquire whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction.'" (People v. Hernandez (2003) 111 Cal.App.4th 582, 589, 3 Cal.Rptr.3d 586; see also People v. Bland, supra, 28 Cal.4th 313, 121 Cal.Rptr.2d 546, 48 P.3d 1107.) One of the ways in which we can make that determination is to examine the prosecutor's argument to the jury. (People v. Bland, supra, at p. 333, 121 Cal.Rptr.2d 546, 48 P.3d 1107; People v. Guiton (1993) 4 Cal.4th 1116, 1130, 17 Cal.Rptr.2d 365, 847 P.2d 45; People v. Brown (1988) 45 Cal.3d 1247, 1256, 248 Cal.Rptr. 817, 756 P.2d 204.)

C. The prosecutor's argument
During both his opening and closing arguments, the prosecutor concentrated on his version of the kill zone theory of intent to kill. He began with: "[From t]he facts of the trial ... you will see ... that [appellant] fired a gun. [¶] When he fired that gun he intended to kill. He intended to kill Joel F[.] or another person inside of *186 ... the `kill zone'...." "The next question I would like to talk about [is] who [was] he trying to kill, and I've talked a couple of times about what's referred to as the `kill zone'.... [¶] When [appellant] got that gun and went to the carnival, ... he wasn't thinking [about] Joel F[.] ... hadn't singled out Joel F[.] ... as an individual. He was looking for a group of that rival gang, a Norteno [¶] ... and he went back with that gun to find one of them...." "When [appellant] is shooting, ... he's going to kill somebody within that `kill zone'. Joel F[.] was one of them. There were others there as well.... And I want to make that clear and I'm actually going to read the language that the judge did for you right out of the jury instruction that you were just read which talks about this. [¶] ... This instruction was created for situations just like what we have here in this trial.... [¶] [It says that i]n order to convict [appellant] of the attempted murder ... of Joel F[.], the People must prove either that [appellant] intended to kill Joel F[.], or that he not only intended to kill another human being but also that he intended to kill anyone within the `kill zone'.... And then it goes on in that Joel F[.] was in the zone of harm or `kill zone'. [¶] Again, this instruction is the scenario that we have right here. There are a group of individuals, Joel F[.] ... is just one of them.... Was he in that `kill zone'? Absolutely. [¶] ... [¶] These were the Nortenos and he was just trying ... to kill one of those individuals in there; Joel F[.] ... being one of them...." "He didn't specifically go for Joel F[.] He was just one in that `kill zone' and he intended to kill someone in there, and that's why the instructions are important."
In rebuttal, the prosecutor castigated defense counsel for not addressing the kill zone instruction:
"Again, that `kill zone' is important. And the whole time in counsel's argument not once did you hear him want to talk about that `kill zone'. He wants to say `intended to kill Joel F[.] ... [¶] Again, the Judge gave you the law that's applicable to the facts of this case. He read you that instruction for a reason. That's the law that applies to these facts. [¶] That `kill zone'.... There's no evidence he even knew Joel F[.] by name. He was just one of that group that was in that `kill zone'. Okay? And that's why he fired. He was, Joel F[.] was in that zone and so were others. Okay? And that's the legal concept. [Defense counsel] does not want to talk about that `kill zone'.... [¶] And the reason is it's because when you look at that law it explains the situation. It explains crazy people like [appellant] who just goes and shoots at people in a crowd. Okay? [¶] Those people don't have a specific one; you and only you; any of you in that zone.... That's what this law covers...."
Beyond doubt, we must conclude from both the trial court's instructions and the argument of the prosecutor that appellant was tried on the theory that the jury could find specific intent to kill the named victim on the basis of finding (1) that the named victim was in a kill zone created by appellant and (2) that appellant indiscriminately intended to kill a personany person within that zone when he fired his gun.

D. Conclusion and prejudice
The question remains whether, despite the trial court's and the prosecutor's erroneous reliance on the kill zone theory of concurrent intent stemming from People v. Bland, they were nonetheless correct in the proposition that one can be guilty of attempting to murder a particular victim by firing into a crowd with the indiscriminate intent to kill somethat is, any member of that crowd. We note that respondent *187 does not so argue. The idea, however, is not without logic.
As Justice Mosk noted in his concurring opinion in People v. Scott (1996) 14 Cal.4th 544, 59 Cal.Rptr.2d 178, 927 P.2d 288,
"express malice aforethought does not exist in the perpetrator only in relation to an intended victim. True, an unlawful intent to kill almost always happens to be directed at an intended victim. The reports demonstrate that such an intent is rarely possessed as to everyone in general or no one in particular. But there is no requirement of an unlawful intent to kill an intended victim. The law speaks in terms of an unlawful intent to kill a person, not the person intended to be killed." (Id. at pp. 555-556, 59 Cal.Rptr.2d 178, 927 P.2d 288, citing Pen.Code, § 188 [defining express malice as an "intention unlawfully to take away the life of a fellow creature"].)
But the issue in Scott was whether a murder charge involving an untargeted victim could stand despite an attempted murder charge against the targeted victim, and Justice Mosk was careful to note his discussion addressed "liability for murder." (Id. at p. 556, 59 Cal.Rptr.2d 178, 927 P.2d 288.) We speak here of liability for attempted murder which, as we know from Bland, presents issues different and "far more complex" than those presented in cases where the defendant's intent to kill has come to fruition. (People v. Bland, supra, 28 Cal.4th at p. 326, 121 Cal. Rptr.2d 546, 48 P.3d 1107.)
The facts in People v. Campos, supra, 156 Cal.App.4th 1228, 67 Cal.Rptr.3d 904 present a classic kill zone situation. The defendants fired a barrage of bullets into a vehicle occupied by three people. Two victims died, one did not. (Id. at p. 1233, 67 Cal.Rptr.3d 904.) The defendants contended on appeal that the standard kill zone instruction from CALCRIM No. 600 was ambiguous in that it mentions both an intent to kill "anyone" and an intent to kill "everyone" within the kill zone. (Campos, at p. 1241, 67 Cal.Rptr.3d 904.) The appellate court recognized the ambiguity but found it harmless. In dicta, and without citation to authority, the court also said:
"[I]in the context presented here, there is little difference between the words 'kill anyone within the kill zone' and `kill everyone within the kill zone.' In both cases, there exists the specific intent to kill each person in the group. A defendant who shoots into a crowd of people with the desire to kill anyone he happens to hit, but not everyone, surely has the specific intent to kill whomever he hits, as each person in the group is at risk of death due to the shooter's indifference as to who is his victim." (People v. Campos, supra, 156 Cal.App.4th at p, 1243, 67 Cal.Rptr.3d 904.)
While this logic is not without appeal, we find it unsupported by authority and, indeed, contrary to the Supreme Court's opinion in Bland. There, the court limited the potential scope of liability for attempted murder:
"A person who intends to kill only one is guilty of the attempted (or completed) murder of that one but not also of the attempted murder of others the person did not intend to kill." (People v. Bland, supra, 28 Cal.4th at p. 317, 121 Cal. Rptr.2d 546, 48 P.3d 1107.)
The court distinguished between an intent to kill "the alleged victim" and "someone else":
"To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder *188 of the intended victim, but not of others." (People v. Bland, supra, 28 Cal.4th at p. 328,121 Cal.Rptr.2d 546, 48 P.3d 1107.)
Finally, the court noted the potential sweep of a different approach:
"This concern is real. The world contains many people a murderous assailant does not intend to kill. Obviously, intent to kill one person cannot transfer to the entire world. But how can a jury rationally decide which of many persons the defendant did not intend to kill were attempted murder victims on a transferred intent theory? To how many unintended persons can an intent to kill be transferred? Just as acts with implied malice constitute murder of anyone actually killed, but not attempted murder of others, so, too, acts with the intent to kill one person constitute murder of anyone actually killed, but not attempted murder of others." (People v. Bland, supra, 28 Cal.4th at p. 329, 121 Cal.Rptr.2d 546, 48 P.3d 1107.)
In the above quoted hypothetical offered in Campos, for example, does the shooter's liability for attempted murder extend to potential victims who were in the crowd of people but who were not "hit"? What if the edges of the crowd were not clear?
One might argue that Bland is an opinion concerning only the doctrine of transferred intent. But isn't that what the trial court and prosecutor here suggested could be donethe transfer of intent to kill from "just one of that group" to Joel F., the victim named in the criminal charge?
In People v. Anzalone (2006) 141 Cal. App.4th 380, 45 Cal.Rptr.3d 876, the defendant fired two shots from a gun: one in the direction of a victim who was standing alone and the other in the direction of three victims who stood together. He was convicted of four counts of attempted murder, and the appellate court reversed three of those countsthose that related to the three victims toward whom one shot had been fired. (Id. at pp. 383-384, 45 Cal. Rptr.3d 876.) Though the trial court had given no offending instruction, it also had failed to correct the prosecutor's argument, which was as follows:
"`Anytime someone is within the zone of danger, ... somebody indiscriminately shoots towards a crowd of people, everything in that zone of danger qualifies. That is how you can get three counts of attempted murder [from one shot]....'" (People v. Anzalone, supra, at p. 391, 45 Cal.Rptr.3d 876.)
The appellate court said that, from this argument, "the jury would have reasonably understood that to find attempted murder it was required to find appellant intended to kill at least one of the men standing by the car; but once it did so, it could find appellant guilty of three additional counts of attempted murder simply because the other victims were in the `zone of danger.'" (People v. Anzalone, supra, 141 Cal.App.4th at p. 396, 45 Cal.Rptr.3d 876.) In other words, the reasonable interpretation of the prosecutor's argument was that, as long as the defendant intended to kill someone when he indiscriminately shot into a "kill zone," then he could be convicted of the attempted murder of anyone who occupied that zone. And that was an incorrect statement of the law. (Id. at pp. 393, 396, 45 Cal.Rptr.3d 876.)
In People v. Smith (2005) 37 Cal.4th 733, 37 Cal.Rptr.3d 163, 124 P.3d 730, the defendant was convicted of two counts of attempted murder stemming from his firing of one bullet in the direction of a baby and his mother. The court affirmed the conviction but, in doing so, it made clear that no kill zone theory applied. (Id. at pp. 745-746, 37 Cal.Rptr.3d 163, 124 P.3d 730.) Instead, the court found the evidence supported the proposition that the *189 defendant had intended that his single bullet hit and kill both the baby and the mother, who were both, one behind the other, directly in his line of fire. (Id. at pp. 742-744, 37 Cal.Rptr.3d 163, 124 P.3d 730.) That evidence satisfied the requirement that, with respect to each of the two alleged victims, the prosecution prove the defendant intended to kill "that victim." (Id. at p. 739, 37 Cal.Rptr.3d 163, 124 P.3d 730.)
We conclude that the case against appellant was presented to the jury on an erroneous theory of guilt. Further, we disagree with respondent's assertion that appellant suffered no prejudice. There is, in this case, not only a possibility but a high probability that the jury convicted appellant, on count 1, on the erroneous theory presented to it. In fact, as we discuss in the next section of this opinion, the erroneous theory of guilt was the only one supported by the evidence. Under any test, the error was prejudicial. (People v. Bland, supra, 28 Cal.4th at p. 332, 121 Cal.Rptr.2d 546, 48 P.3d 1107 ["`the question is whether there is a "reasonable likelihood" that the jury understood the charge as the defendant asserts'"].)
2.-3.[**]

DISPOSITION
The judgment on count 1 is reversed, as is the gun use enhancement and gang allegation attached to that count. The court is directed to correct abstract of judgment form CR-292 to accurately reflect the reversal of count 1; to properly designate counts 3, 4, and 5, each, as "attempt to dissuade a witness"; and to accurately reflect that each of those counts carries with it a seven years to life sentence. The court is directed to forward a copy of the corrected abstract of judgment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.
WE CONCUR: GOMES, Acting P.J., and KANE, J.
NOTES
[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts 2 and 3 of Discussion.
[1] The standardized instruction reads in part as follows: "A person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or `kill zone.' In order to convict the defendant of the attempted murder of ____ , the People must prove that the defendant not only intended to kill ____ but also either intended to kill ____ , or intended to kill anyone within the kill zone. If you have a reasonable doubt whether the defendant intended to kill ____ or intended to kill ____ by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of ____ ." (CALCRIM No. 600.)
[2] We note another ambiguity in that the final sentence refers to an intent to harm everyone in the kill zone, rather than to kill everyone in the zone.
[**] See footnote *, ante.