Filed 4/3/14  P. v. Ivy CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>DEVAUGHN LEE IVY,<br><br>Defendant and Appellant. | C071077<br><br>(Super. Ct. No. SF118684A) |

Defendant DeVaughn Lee Ivy fired multiple rounds from a semi-automatic SKS rifle at rival gang member Antoneyo Robinson, who was standing in front of a liquor store in Stockton.  Robinson's girlfriend, Bretina Moore, was standing next to her car across the street when defendant opened fire.  Their infant son, Jayshawn, was seated in a car seat in the back of the vehicle.  Robinson ran for the car.  Moore, now in the driver's seat, waited for Robinson to get inside and then drove away at a high rate of speed.  Defendant got into a car driven by another man and followed, firing at least 11 additional rounds into the back of Moore's car before abandoning the pursuit.  A bullet fragment

1

struck Jayshawn in the back of the head and lodged beneath the skin. Fortunately, the fragment had slowed considerably due to its impact with the car and did not cause a fatal injury.

Convicted by jury of three counts of premeditated attempted murder (Counts 1-3), one count of shooting at an occupied vehicle (Count 4), three counts of assault with a semi-automatic firearm (Counts 5-7), and one count of causing corporal injury to a child (Count 8), with various firearm and great bodily injury enhancement allegations found to be true, defendant was sentenced to serve an indeterminate term of 25 years to life, plus three consecutive life terms, plus a consecutive determinate term of 13 years 4 months in state prison.

On appeal, defendant contends: (1) the evidence is insufficient to support his convictions for the attempted murders of Moore and Jayshawn (Counts 2 and 3); (2) defendant's trial counsel rendered constitutionally deficient assistance by (a) failing to object to certain statements made by the prosecutor during closing argument concerning the concurrent intent (i.e., kill zone) theory of attempted murder, and (b) stating during the defense closing argument the SKS rifle was "an attempted murder weapon" and a kill zone was created within Moore's car during the shooting; and (3) the trial court prejudicially erred and violated his constitutional rights by telling the jury, in response to a question concerning the premeditation allegation attached to Counts 2 and 3 (i.e., "can you use that same kill zone scenario for premeditation?"), "yes, the jury can use the theory and logic of the kill zone in determining whether or not it was willful, deliberate, premeditated." We affirm. As we explain, the evidence was more than sufficient to support defendant's attempted murder convictions in Counts 2 and 3. Defense counsel's performance during his and the prosecutor's closing arguments did not fall below an

2

objective standard of reasonableness. And the trial court's response to the jury's question did not misstate the law or violate defendant's constitutional rights.

FACTS

Defendant and Robinson were members of rival street gangs. Defendant was a member of the Taliban Crips. Robinson was a member of the Sutter Street Crips. These rival gangs fought over who could sell drugs in certain areas of Stockton. Robinson and Michael McKinney, one of the leaders of the Sutter Street Crips, routinely sold drugs near the Cal Park liquor store, at the intersection of California Street and Park Street. At one time, defendant, Robinson, and McKinney were friends.

On January 26, 2011, around 7:00 p.m., defendant left his house on the north side of Stockton in a Honda Accord belonging to one of his roommates, Alicia Colwart. He brought with him a semi-automatic SKS rifle he kept in his room. Defendant had previously told another roommate, Michael Patrick, that he "had problems" with McKinney and needed the rifle "for protection."

About an hour later, Robinson called Moore on her cell phone and told her to meet him at Cal Park. Moore, who was at her mother's house with Jayshawn about a mile away, placed the child in a car seat in the back of her Chevy Caprice and drove to the liquor store. She parked across Park Street. Robinson was in the store's parking lot with a group of people. As Moore described, "everybody was just out there talking." One of Moore's friends, who was also in the parking lot, walked over to Moore's car and agreed to watch Jayshawn while Moore went into the store to buy a bottle of water. Robinson walked over to Moore as she crossed the street. They entered the store together, but Robinson returned to the parking lot while Moore spoke briefly with the store owner, paid for the water, and then walked back to the Caprice.

3

When Moore reached the driver's side door, defendant opened fire on the parking lot with the SKS rifle. He was standing outside Colwart's car on the corner of Park Street and American Street, one block east of the liquor store. From this position, defendant fired "five to seven" rounds. His intended target was Robinson, who ran to Moore's car after the shooting stopped and got in the front passenger seat. Moore, now in the driver's seat, drove away as Jayshawn cried in his car seat.

Defendant got into the passenger side of the Accord, which was being driven by another man, and followed in pursuit. They caught up with the Caprice several blocks down Park Street. "Hanging out the passenger side window," defendant fired at least 11 rounds into the back of Moore's car. Bullets struck the trunk and rear window, shattering the glass. One of the bullets fragmented upon impact with the car and struck Jayshawn in the back of the head, lodging in the muscle beneath the skin. As Moore described the chaotic scene inside the car: "First I heard like dinging, dinging, that is when I turned around and seen the lights. [Robinson] told me to go and more bullets kept coming, my back window shattered down. A bullet came through the vehicle, went -- one went through my radio. As I had my foot all the way on the pedal, [Robinson] reached over and grabbed the steering wheel. I hit a garbage can at the time that he reached over and grabbed the steering wheel, a bullet came through the back and straight through the front window. We kept going, and once we hit the garbage can, the vehicle behind us turned off." Moore continued down Park Street, got onto Interstate Highway 5, and drove to their house.

When they reached the house, Moore inspected Jayshawn and discovered he had been hit by one of the bullets. She called 911. Robinson "yelled that they had shot his baby in the head" and "walked out" of the house. Police and emergency medical personnel arrived a short time later. Jayshawn was transported to San Joaquin General

4

Hospital and then transferred to Children's Hospital in Oakland. The chief of surgery explained that, had the fragment not slowed considerably due to the bullet's impact with the car, it would have penetrated "through the spinal cord and through the brain which would have been almost certainly a fatal injury." The decision was made to clean and dress the wound and allow the fragment to "work itself out on its own."

A few days later, defendant was again seen in the passenger seat of the same car near the Cal Park liquor store. This time, McKinney was standing next to the store. As the car drove south down California Street in front of the store, defendant pointed a gun at McKinney, who ran behind a woman. The car then drove away without shots being fired.

Defendant was arrested on February 9, 2011. His house was searched the same day. The SKS rifle was recovered from the living room. The rifle's magazine contained 26 unfired TulAmmo 7.62 by 39 millimeter rounds. A single unfired round was in the chamber. Another round was sitting on the coffee table. Three shell casings were found elsewhere in the house. Shell casings of the same brand and caliber recovered from the scene of the shooting were determined to have been fired by defendant's rifle.

In addition to the forensic evidence, the prosecution presented eyewitness testimony from Delbert Rivers. About an hour before the shooting, Rivers robbed a gas station four blocks from Cal Park. He then ran to his house a short distance away, got onto his bicycle, and made his way to a house diagonally across the intersection from the liquor store. Rivers described the shooting recounted above and identified defendant as the shooter. Rivers was arrested for a string of robberies about a week after defendant was arrested for the shooting. Several months later, Rivers and defendant were in the same elevator at the San Joaquin County courthouse. Defendant said, "what's going on" to Rivers, who told defendant not to speak to him and added: "[Y]ou shot that baby and I

5

don't play that kind of stuff, I don't, you know, go like that. You don't shoot kids." Defendant responded that "he was trying to shoot [Robinson] and not the child."

DISCUSSION

I

### *Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support his convictions for the attempted murders of Moore and Jayshawn. Specifically, he argues: "At most, the evidence supported a reasonable inference that Robinson . . . was targeted. But the targeting of Robinson cannot be the basis for convicting [defendant] of the attempted murders of Moore and Jayshawn. There is no evidence that [defendant] intended to kill Moore and Jayshawn. Indeed, the evidence indicated that an unseen Jayshawn was secreted in the back seat out of the public and [defendant's] view." We are not persuaded.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) The standard of review is the same in cases in which the prosecution relies on circumstantial evidence. (*People v. Snow* (2003) 30 Cal.4th 43, 66.) " 'Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is the jury, not the appellate court which must be convinced of the defendant's guilt beyond a reasonable doubt.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 792-793.) Accordingly, we must

6

affirm the judgment if the circumstances reasonably justify the jury's finding of guilt regardless of whether we believe the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.)

The mental state required for attempted murder differs from that required for murder. Murder requires malice, express or implied. Express malice, i.e., intent to kill, requires a showing the defendant either desired the death of the victim, or knew to a substantial degree of certainty death would occur. (*People v. Smith* (2005) 37 Cal.4th 733, 739.) Implied malice simply requires a showing the defendant consciously disregarded human life. (*People v. Lasko* (2000) 23 Cal.4th 101, 107.) Attempted murder requires express malice; a conscious disregard for life will not suffice to support a conviction for attempted murder. (*People v. Bland* (2002) 28 Cal.4th 313, 327-328 (*Bland*).)

Another difference between murder and attempted murder involves the doctrine of transferred intent. "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder--due to transferred intent--if the person were killed. To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. The defendant's mental state must be examined as to each alleged attempted murder victim. Someone who intends to kill only one person and attempts unsuccessfully to do so, is guilty of the attempted murder of the intended victim, but not of others." (*Bland*, *supra*, 28 Cal.4th at p. 328; *People v. Stone* (2009) 46 Cal.4th 131, 141.)

However, where the defendant intends to kill a specific target and employs a means of attack designed to kill everyone in the vicinity of the target in order to ensure the death of the target, the defendant creates a "kill zone" around the target, and the jury may reasonably infer the defendant possesses the concurrent intent to kill everyone

7

within the kill zone. (*Bland*, *supra*, 28 Cal.4th at pp. 326-327, 329-330.) " 'The intent is concurrent . . . when the nature and scope of the attack, while directed at a primary victim, are such that we can conclude the perpetrator intended to ensure harm to the primary victim by harming everyone in that victim's vicinity. For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his [or her] primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim.' " (*Id*. at pp. 330-331, quoting *Ford v. State* (1993) 625 A.2d 984, 1000-1001.)

This case is indistinguishable from *Bland*, *supra*, 28 Cal.4th 313, in which the defendant and another man, both gang members, fired several rounds into a car driven by a rival gang member. The car also contained two passengers. Convicted of the first degree murder of the driver and the premeditated attempted murders of the passengers, the Court of Appeal reversed the attempted murder convictions. (*Id*. at p. 318.) Our Supreme Court reversed. After adopting the "kill zone" theory of concurrent intent, set forth above, the court explained: "This case permits—virtually compels—a similar inference. Even if the jury found that defendant primarily wanted to kill [the driver] rather than [the] passengers, it could reasonably also have found a *concurrent* intent to kill those passengers when defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone. Such a finding fully supports attempted murder convictions as to the passengers." (*Id*. at pp. 330-331.) So too here. While the jury

8

likely concluded defendant's primary target was Robinson, it could reasonably also have found defendant employed a means of attack designed to kill everyone in the car in order to ensure Robinson's death and therefore possessed the concurrent intent to kill everyone within the car. Nor does it matter whether defendant could see that Jayshawn was in the car seat. (See *People v. Adams* (2008) 169 Cal.App.4th 1009, 1022-1023; see also *People v. Vang* (2001) 87 Cal.App.4th 554, 563-564 [where the jury drew a reasonable inference the "defendants harbored a specific intent to kill every living being within the residences they shot up," it did not matter that "they could not see all of their victims"].)

We conclude the evidence is sufficient to support defendant's convictions for the attempted murders of Moore and Jayshawn.

## II

### *Ineffective Assistance of Counsel*

Defendant also claims his trial counsel rendered constitutionally deficient assistance by (a) failing to object to certain statements made by the prosecutor during closing argument concerning the kill zone theory, and (b) conceding certain points during the defense closing argument. We disagree.

A criminal defendant has the right to the assistance of counsel under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him [or her] to 'the reasonably competent assistance of an attorney acting as his [or her] diligent conscientious advocate.' [Citations.]" (*Ibid.*, quoting *United States v. DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his [or her] "representation fell below an objective

9

standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he [or she] must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) In determining whether counsel's performance was deficient, we must exercise "deferential scrutiny" (*People v. Ledesma, supra*, 43 Cal.3d at p. 216) and refrain from engaging in "the perilous process of second-guessing" counsel's rational tactical decisions. (*People v. Miller* (1972) 7 Cal.3d 562, 573.) Where, as here, the record does not contain an explanation for the challenged aspect of representation, the judgment must be affirmed on appeal unless counsel was asked for an explanation and failed to provide one or there simply could be no satisfactory explanation. (*People v. Pope* (1979) 23 Cal.3d 412, 425, overruled on another ground as stated in *People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1372.) Thus, we may reverse " 'only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his [or her] act or omission.' [Citation.]" (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

We turn now to defendant's specific arguments, neither of which has merit.

### A.

### *The Prosecutor's Argument*

During closing argument, the prosecutor made the following statements regarding the kill zone theory:

10

"Now, we talked about a direct step indicating a definite unambiguous intent to kill, and he did that when he fired that assault rifle, and it's a direct movement towards the commission of a crime. Now we know his target was [Robinson], but attempted murder also applies when the defendant creates something called a kill zone, and that's what he did here. The law says a person may intend to kill a specific victim and at the same time intend to kill everyone in a particular harm or kill zone. The jury instruction on kill zone says this: [']A person, the defendant, may intend to kill a specific victim, [Robinson], and at the same time intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of the attempted murders of [Moore] and/or Jayshawn, the People must prove that the defendant not only intended to kill [Robinson], but either intended to kill Jayshawn and [Moore], or everyone within the kill zone,['] and his intent was to kill everybody in that car. He's not specifically targeting [Robinson], he's shooting [Robinson's] car up. His rounds went straight in through the left driver's side, through the right driver's side. We know it went through the trunk, through the backseat fragmenting through the car seat, that's a kill zone.

"We know the back window was shot out, the bullet holes went through the very front window. He's not being discriminatory about who he is trying to shoot, he's trying to shoot everybody in that car, and that's creating a kill zone through the car seat, through the back window, and we know it fragments and ends up there in Jayshawn's head."

Defendant argues his trial counsel provided ineffective assistance by failing to object to these statements because they "misrepresent[ed] and incorrectly inform[ed] the jury on the law" of concurrent intent. According to defendant, "[t]rying to shoot everybody in the car did not create a kill zone whereby everybody was concurrently targeted to be killed." He is mistaken. As we have already explained, from defendant's act of firing at least 11 rounds into the back of Moore's car, the jury could reasonably

11

have concluded he possessed the concurrent intent to kill everyone within the car.  The prosecutor's argument simply stated as much.  Nor is this case like *People v. Anzalone* (2006) 141 Cal.App.4th 380, in which the Court of Appeal held the prosecutor misstated the law by arguing the defendant there could be convicted of four counts of attempted murder based on only two gunshots fired into a crowd simply because all four alleged victims were in "the zone of danger."  (*Id*. at pp. 391-393.)  Here, the prosecutor accurately described the kill zone theory and argued it applied to the facts of this case.  Defense counsel appropriately did not object.

## B.

### *Defense Counsel's Argument*

Defendant also argues his trial counsel provided ineffective assistance by conceding during the defense closing argument that the SKS rifle was "an attempted murder weapon" and a kill zone was created within Moore's car.  With respect to the kill zone theory, defense counsel stated:  "The Prosecutor said that the shooter attempted to kill everyone.  He says that the person had the intention to kill everyone . . . within this kill zone, that is, if some people are standing on the sidewalk and a car goes by and does a drive-by and they only want to shoot one person but they actually hit two of them and they don't die, because the kill zone is kind of an attempted murder situation as opposed to a murder thing, so it would not apply to that.  A couple of people are wounded, you don't have to actually attempt to kill everyone, but he thinks that the person attempted to kill everyone.  I think that's probably the right -- I think that's probably the right analysis based on the facts of just the physical, the number of shots and the close range and heavy weapon and all those kinds of things like that that there was an intention."

Defendant argues these concessions "for all practical purposes denied [him] his right to have guilt or innocence decided by the jury."  Not so.  In light of the

12

overwhelming evidence the SKS rifle was used in the shooting and a kill zone was created within Moore's car, defense counsel made a reasonable tactical decision to concede these points and argue someone other than defendant was the shooter. Specifically, in over 70 pages of reporter's transcript, defense counsel urged the jury to believe the testimony of defendant's sister, Brittany Ivy, i.e., that defendant was on a pizza run in a different car with Patrick and another man when the shooting occurred and Colwart had taken her car earlier in the day and did not return until later that night. Defense counsel also challenged the credibility of Rivers and Patrick, argued the prosecution had not established any motive on defendant's part, and posited whoever committed the crime, likely a member or associate of the Taliban Crips, brought the SKS rifle over to defendant's house sometime after the shooting. Given the state of the evidence, defense counsel reasonably could have concluded that challenging either the SKS rifle was used in the crime or Moore's car was turned into a kill zone by the firing of at least 11 rounds into the back of the car would lessen his credibility in the eyes of the jury and the strength of his defense that defendant was not the shooter. (See *People v. Hart* (1999) 20 Cal.4th 546, 631 ["trial counsel reasonably could have concluded that challenging the evidence more vigorously in his argument risked alienating the jury"].)

Defense counsel's performance during his and the prosecutor's closing arguments did not fall below an objective standard of reasonableness.

## III

### *Instructional Error*

Finally, we reject defendant's assertion the trial court prejudicially erred and violated his constitutional rights by telling the jury it could "use the theory and logic of the kill zone in determining whether or not [the attempted murders charged in Counts 2 and 3 were] willful, deliberate, premeditated."

13

After returning guilty verdicts on all counts, the jury foreperson stated the jury was unable to reach a unanimous decision as to the premeditation allegation attached to Counts 2 and 3. The trial court asked: "Does anyone have any questions I might be able to answer that would be of assistance as to that issue? Anyone have any questions you want to ask about that? [¶] [Foreperson], do you feel that if you had any additional time that that would be of assistance in being able to reach a verdict? In other words, is there a reasonable likelihood the jury would be able to reach a verdict as to that issue?" The foreperson answered: "It's a possibility, Your Honor." The trial court then sent the jury home for the day and ordered the jurors to resume their deliberations at 9:00 a.m. the following day.

Shortly after deliberations resumed, the jury sent the trial court two notes. The first note stated: "Please explain or interpret the definition of the prem[e]ditation, expand with further explanation." The second note stated: "Please elaborate and expand on 'kill zone' as it applies to willfulness, deliberation and prem[e]ditated." In response to these notes, the trial court brought the jury into the courtroom and re-read CALCRIM Nos. 600 and 601.

After re-reading CALCRIM No. 600[1] to the jury, the trial court stated: "Then the key instruction really is [CALCRIM No.] 601 because the defendant has been found

[1]    As re-read to the jury, CALCRIM No. 600 stated: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] 1. The defendant took at least one direct, but ineffective step toward killing another person; and [¶] 2. The defendant intended to kill that person. [¶] A direct step requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his plan into action. [¶] A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. [¶] It is an immediate step that puts the plan in motion, so that the plan would not -- so that the plan would have been completed if some

14

guilty of attempted murder by the jury as to [Moore] and [Jayshawn]. So the remaining issue is whether or not it was willful, deliberate, premeditated. So [CALCRIM No.] 601 covers that." As re-read to the jury, CALCRIM No. 601 stated: "If you find the defendant guilty of attempted murder, you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully and with deliberation and premeditation. [¶] The defendant acted willfully if he intended to kill when he acted. [¶] The defendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [¶] The defendant decided to kill -- the defendant premeditated if he decided to kill before acting. [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved."

---

circumstances outside the plan had not interrupted the attempt. [¶] A person may intend to kill a specific victim or victims and, at the same time, intend to kill everyone in a particular zone of harm or kill zone. In order to convict the defendant of the attempted murder of [Jayshawn] or [Moore], the People must prove that the defendant not only intended to kill [Robinson], but also either intended to kill [Jayshawn] or [Moore], or intended to kill everyone within the kill zone. [¶] . . . [¶] If you have a reasonable doubt whether the defendant intended to kill [Moore] or [Jayshawn] or intended to kill [Robinson] by killing everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of [Moore] or [Jayshawn]."

15

The trial court then asked the foreperson: "So does that answer the question[?]" The foreperson answered: "Somewhat." In response to the trial court's solicitation of any further questions, Juror No. 10 asked: "Based on the finding has been that attempted murder and if you use the logic or the scenario of kill zone in that situation [¶] . . . [¶] but then you are struggling with using that same -- or can you use that same kill zone scenario for premeditation? That's the question." Following a discussion at bench, the trial court answered: "To answer the question, yes, the jury can use the theory and logic of the kill zone in determining whether or not it was willful, deliberate, premeditated."

Defendant argues the trial court abused its discretion by answering this question. We disagree. "When a jury asks a question after retiring for deliberation, [Penal Code] '[s]ection 1138 imposes upon the court a duty to provide the jury with information the jury desires on points of law.' [Citation.] But '[t]his does not mean the court must always elaborate on the standard instructions. Where the original instructions are themselves full and complete, the court has discretion under [Penal Code] section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.' [Citation.] We review for an abuse of discretion any error under [Penal Code] section 1138. [Citation.]" (*People v. Eid* (2010) 187 Cal.App.4th 859, 881-882.) Here, at the time the question was asked, the jury had already found defendant guilty of the attempted murders of Robinson, Moore, and Jayshawn, and further that the attempted murder of Robinson was done willfully and with deliberation and premeditation. Given the facts of this case, and the content of Juror No. 10's question, it is reasonable to conclude the jury found defendant guilty of the attempted murders of Moore and Jayshawn based on the kill zone theory of concurrent intent, but struggled with whether or not defendant could be found guilty of the willful, deliberate, and premeditated attempted murders of Moore and Jayshawn based on the fact he willfully and with

deliberation and premeditation attempted to kill Robinson by employing a means of attack designed to kill everyone in the car, including Moore and Jayshawn. The answer is "yes." We conclude this is what the jury would have understood the trial court to mean by "us[ing] the theory and logic of the kill zone in determining whether or not [these attempted murders were] willful, deliberate, premeditated." The trial court did not abuse its discretion in so instructing the jury.

DISPOSITION

The judgment is affirmed.


                                             HOCH      , J.



We concur:



      RAYE     , P. J.



      ROBIE    , J.


17