Filed 5/20/14  P. v. Vicary CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D063404 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JCF28830) |
| ANDREW AARON VICARY, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Imperial County, Donal B. Donnelly, Judge.  Affirmed.

Dacia A. Burz, by appointment of the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Amanda E. Casillas, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Andrew Aaron Vicary of the attempted murder of his wife (the victim) (count 1: Pen. Code,[1] §§ 664, 187, subd. (a)) and found true an allegation that the attempted murder was willful, premeditated, and deliberate. The jury also convicted Vicary of corporal injury to his spouse (count 2: § 273.5, subd. (a)). The court sentenced him to an indeterminate state prison term of life with the possibility of parole for his first degree attempted murder conviction. The court also imposed the upper term of four years for Vicary's count 2 conviction, but stayed execution of the sentence under section 654.

Vicary appeals, contending his attempted murder conviction must be reversed because (1) his trial counsel provided prejudicial ineffective assistance by failing to object when, during closing argument, the prosecutor misstated the proper legal standard for assessing the adequacy of provocation that reduces an attempted murder to attempted voluntary manslaughter committed in the heat of passion; and (2) the prosecutor's misstatement of the correct standard for assessing provocation prejudicially injected ambiguity into the attempted voluntary manslaughter jury instruction (CALCRIM No. 603) given by the court, resulting in a miscarriage of justice. We affirm the judgment.

---

[1]     Undesignated statutory references are to the Penal Code.

2

FACTUAL BACKGROUND

A.  *The People's Case*

On May 17, 2012, Vicary and his wife, the victim in this case, lived together in a tent in Slab City, a campground outside the City of Niland in Imperial County.  Andra Dakota was socializing at one of the campsites in Slab City.  Dakota testified that, while she was sitting outside around noon, she heard a "loud squealing noise" that sounded like "an animal being slaughtered."  Realizing the next scream was from a person screaming, she ran towards the sound which came from another campsite.  When she reached that campsite, she saw Vicary and the victim, both of whom she had met.  The victim was lying flat on her back on the ground, and Vicary was bent over her with one foot on either side of her body and choking her with his hands on her neck.

Dakota testified she screamed at Vicary, "What the fuck are you doing; what the fuck are you doing?"  Vicary immediately let go of the victim and stood up.  In a "jittery" state, Vicary said, "She was going to leave me; she was going to leave me."  He then stepped to one side and ran off.

Dakota went over to the victim, who was unconscious and not breathing.  Dakota thought she was dead.  The victim's mouth was open and her eyes had rolled back into her head.  Dakota repeatedly shook the victim, and she started coughing and breathing again.  About a couple of minutes later, the victim regained consciousness and started muttering, but Dakota could not understand what she was saying.

3

Shortly thereafter, Imperial County Deputy Sheriff Pompeyo Tabarez, firefighter and paramedic Aaron Castro, and an emergency medical technician arrived at the scene. Castro testified he saw someone taking care of the victim, who was lying on her back with a broken chair underneath her. The victim told him that her husband had strangled her and that her head had struck a pole inside the tent. In response to the prosecutor's questions, Castro testified the victim did not mention anything to him about suffering her injuries as a result of rough sex or a bondage game. Castro put a neck brace on her and other paramedics put her in an ambulance.

Deputy Tabarez testified that when he arrived at the scene, he saw through the mesh netting of the tent that the victim was inside the tent, lying on the ground as Dakota was giving her first aid. The victim was conscious but had a hard time speaking because her throat was injured. Deputy Tabarez also testified he had received training on injuries caused by strangulation. He saw the victim had red marks and bruises on her neck, and in the corner of the whites of her eyes he observed small blood spots called petechiae that result from the bursting of blood vessels caused by pressure on the neck and lack of oxygen. The victim's voice was deep and "raunchy," and he could hear a "little whispering in the back" that sounded like a whistle. Based on his domestic violence training, Deputy Tabarez opined that the victim's bruising, red marks, petechiae, rolled back eyes, and voice were consistent with strangulation.

Deputy Tabarez testified he used his cell phone to videotape the victim's statements about the incident. Two videotaped recordings of her statements, which Deputy Tabarez testified accurately reflected what she said, were played for the jury.

4

In the recordings, the victim stated she and Vicary "were arguing because [she] was inside the tent and [she] was hot, and [she] wanted to get out. It took [her] an hour and a half to [two] hours to finally get out of the tent, and [she] yelled at [Vicary], saying that [she] hated him for doing that to [her]" because she "had to go to the bathroom, and [she was] fricking thirsty, and [she] was hot." She told Vicary she did not want him around her. Vicary got mad, started tapping her on the back of her shoulders, grabbed hold of her, slammed her head against the wall, and choked her from behind. The victim told Deputy Tabarez that after her head hit the "wooden stick," she was on the ground. She stated she "yelled once" and "then [she] saw the lady and her boyfriend on top of [Vicary]." She told Deputy Tabarez she was "not really" trying to break up with Vicary, and she was "just mad at him." The victim told Deputy Tabarez there had been a prior domestic violence incident in Slab City "[t]wo days before Christmas [in which] he blacked both of my eyes, busted my nose, had blood coming out of my lip and out the back of my head from a rock."

Two civilians brought Vicary to the Niland police substation. Deputy Tabarez testified that after Vicary waived his *Miranda*[2] rights, he voluntarily agreed to make statements about the incident. During the police interview, Vicary told Deputy Tabarez he and the victim were arguing earlier that day and she told him she was leaving him. Vicary said the victim punched him twice and then somehow he was on top of her,

---

2      *Miranda v. Arizona* (1966) 384 U.S. 436.

5

choking her, and then he snapped out of it and started wondering what happened. Vicary told Deputy Tabarez he did not want to kill her.

Leigh Price, a physician's assistant at the hospital where the victim was transported, testified that she performed a physical evaluation of the victim. The examination showed the victim had face, neck, spinal, and wrist pain, but no pain medication was prescribed for her. The prosecutor asked Price for his opinion as to whether certain assumed facts would be consistent with a strangulation. Specifically, the prosecutor asked Price to assume that someone saw a person being strangled and, after the person being strangled was released, that person's eyes rolled back, the person stopped breathing for 10 seconds, regained consciousness after one-and-a-half minutes, experienced problems with speaking, eating, and drinking; and had petechiae in the eyes. Price opined that those assumed facts were consistent with strangulation. Price also opined that death by strangulation would occur in less than 10 minutes if the person being strangled had been punched multiple times in the face and the person's head had been slammed through a chair before the strangulation.

At trial, outside the presence of the jury, the court granted the prosecution's request that the victim be examined as a hostile prosecution witness. In the presence of the jury, the victim stated she was testifying in court "against [her] will." She agreed she was there under subpoena, she did not want to be in court, and she did not want anything to happen to Vicary in this case because she "love[d] him so much." The victim testified Vicary choked her because she liked to engage in bondage and she asked him to strangle

6

her. She acknowledged she did not tell Deputy Tabarez or anyone else that the choking involved bondage.

The victim acknowledged she told Deputy Tabarez about a prior incident around Christmas 2011, five months before the May 17 strangling incident, during which Vicary assaulted her and hit her in the face causing it to bleed. However, she denied that Vicary hit the back of her head with a rock. Instead, she claimed the back of her head hit a rock.

The victim also testified that she and Vicary had argued on the day of the incident because she woke up believing he was on crystal meth and she wanted a divorce. On cross examination, however, she indicated she had only dreamt that Vicary was on crystal meth.

The victim also testified on cross-examination that, later that day, she and Vicary engaged in hostage role-playing foreplay during which Vicary wrestled her to the ground and started choking her. She testified she told Vicary to "do it tighter," but she became unconscious. She also testified she did not think Vicary was trying to kill her.

On recall, Dakota testified that she saw the victim about four or five weeks after the incident at the former campsite in Slab City. Dakota testified the victim told her she almost "capped" (died) in the ambulance that day and was lucky to be alive. The victim also told her that as a result of the choking, her trachea and jaw had been broken, and she suffered permanent injury to one of her eyes.

B. *The Defense*

The defense presented no evidence.

DISCUSSION

On appeal, Vicary raises two contentions in support of his claim that his first degree attempted murder conviction must be reversed. First, he contends his trial counsel provided prejudicial ineffective assistance by failing to object when, during closing argument, the prosecutor misstated the proper legal standard for assessing the adequacy of provocation that reduces an attempted murder to attempted voluntary manslaughter committed in the heat of passion. Second, he contends the prosecutor's misstatement of the standard for assessing provocation prejudicially injected ambiguity into the attempted voluntary manslaughter instruction (CALCRIM No. 603) that the court gave to the jury, causing jury confusion and resulting in a miscarriage of justice. We conclude these contentions are unavailing because Vicary has failed to meet his burden of demonstrating his counsel provided ineffective assistance by failing to object to the prosecutor's misstatement of the law or that the prosecutor's misstatement of the law prejudiced Vicary by causing jury confusion. Accordingly, we affirm the judgment.

A. *Background*

Before the prosecution called its first witness, the court instructed the jury under CALCRIM No. 222 that "[n]othing that the attorneys say is evidence. In their opening statements and closing arguments, the attorneys will discuss the case but their remarks are not evidence."

Following the presentation of evidence and before closing arguments, defense counsel requested that the jury be instructed under CALCRIM No. 603 on the lesser

8

included offense of attempted voluntary manslaughter committed in the heat of passion. The prosecutor did not oppose the request, and the court agreed to give that instruction.

As pertinent here, the court later instructed the jury under CALCRIM No. 200, which stated in part, "You must follow the law as I explain it to you, even if you disagree with it. *If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions*." (Italics added.)

The court also instructed the jury on attempted voluntary manslaughter committed in the heat of passion, as a lesser included offense of attempted murder, by giving a modified version of CALCRIM No. 603.[3]

---

3    The court instructed the jury under CALCRIM No. 603 as follows: "An attempted killing that would otherwise be attempted murder is reduced to attempted voluntary manslaughter if the defendant attempted to kill someone because of a sudden quarrel or in the heat of passion. [¶] The defendant attempted to kill someone because of a sudden quarrel or in the heat of passion if: [¶] One, the defendant took at least one direct but ineffective step toward killing a person. [¶] Two, the defendant intended to kill that person. [¶] Three, the defendant attempted the killing because he was provoked. [¶] Four, *the provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment*. [¶] And five, the attempted killing was a rash act done under the influence of intense emotion that obscured the defendant's reasoning or judgment. [¶] Heat of passion does not require anger, rage or any specific emotion. It can be volatile or intense emotion that caused a person to act without due deliberation and reflection. [¶] In order for a sudden quarrel or heat of passion to reduce an attempted murder to attempted voluntary manslaughter, the defendant must have acted under the direct and immediate influence of provocation as I have defined it. [¶] While no specific type of provocation is required, slight or remote provocation is not sufficient. [¶] Sufficient provocation may occur over a short or long period of time. [¶] It is not enough that the defendant simply was provoked. The defendant is not allowed to set up his own standard of conduct. [¶] You must decide whether the defendant was provoked and whether the provocation was sufficient. *In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts would have reacted from passion rather than judgment*. [¶] If enough time passed between the provocation and the

9

1. *Prosecutor's misstatement of the law regarding provocation*

During closing argument, while attempting to explain the difference between attempted murder and attempted voluntary manslaughter committed in the heat of passion, the prosecutor stated—without an objection from defense counsel—that "[t]he only difference is voluntary manslaughter says that if you find that a person of average disposition—it's an objective standard—*would have acted in the same way* [*Vicary*] *did, then you can find him guilty of that.*" (Italics added.) Immediately thereafter, the prosecutor told the jury, "All I'm going to say to that, ladies and gentlemen, again, this is attempted murder, and *for you to find him guilty of* [*attempted*] *voluntary manslaughter in the heat of passion, you will have to say that this is how a reasonable person should act*, a person of average disposition." (Italics added.)

Soon thereafter, again without an objection from defense counsel, the prosecutor argued:

> "There are a lot of people who get divorced, a lot of relationships that don't work out every year. There's a family court right downstairs [and] probably right now there's a lot of people whose relationships didn't work out. Most people don't go to the extreme of trying to kill their partner when things don't work out. [¶] Everyone, at least most people have been in a relationship that didn't work out, where somebody threatened to leave or somebody did leave. *For you to find him guilty of* [*attempted*] *voluntary manslaughter* [*in the*] *heat of passion, you'll have to decide that . . . what he did was about what anybody else would do based on the circumstances of this case*.

attempted killing for a person of average disposition to cool off and regain his or her clear reasoning and judgment, then the attempted murder is not reduced to attempted voluntary manslaughter on that basis. [¶] The People have the burden of proving beyond a reasonable doubt that the defendant attempted to kill someone and was not acting as the result of a sudden quarrel or in the heat of passion. If the People have not met this burden, you must find the defendant not guilty of attempted murder." (Italics added.)

10

[¶] What he did is not what anyone else would do, ladies and gentlemen.  What he did was serious.  What he did was violent.  And what he did was attempted murder."  (Italics added.)

2.  *Verdicts*

As previously noted, the jury found Vicary guilty of the attempted murder of his wife and found true the allegation that the attempted murder was willful, premeditated, and deliberate.  The jury also found Vicary guilty of inflicting corporal injury upon his wife.

B.  *Analysis*

1.  *Claim of ineffective assistance of counsel*

In support of his claim of ineffective assistance of counsel, citing *People v. Beltran* (2013) 56 Cal.4th 935 (*Beltran*), Vicary first asserts the prosecutor committed misconduct during his closing argument "because he told the jury that adequate provocation for attempted voluntary manslaughter requires an ordinary person be inflamed to *kill*."  (Italics added.)  The Attorney General concedes the prosecutor committed misconduct because his statements to the jury (discussed, *ante*) erroneously "focused on [Vicary's] actions instead of whether a reasonable person under the same circumstances . . . would have been driven to react out of emotion rather than judgment."

We agree the prosecutor committed misconduct by misstating the law regarding the proper standard for assessing the legal sufficiency of provocation.  In *Beltran*, the California Supreme Court recently explained that heat of passion is a state of mind that "precludes the formation of malice and reduces an unlawful killing from murder to manslaughter," and heat of passion is "caused by legally sufficient provocation that

11

causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*Beltran, supra,* 56 Cal.4th at p. 942.) Rejecting an argument similar to the one the prosecutor made in this case,[4] the *Beltran* court explained:

> "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to *kill* focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply *react,* without reflection. To satisfy [the proper standard], the anger or other passion must be so strong that the defendant's reaction bypassed his thought process to such an extent that judgment could not and did not intervene. Framed another way, *provocation is not evaluated by whether the average person would act in a certain way: to kill.* Instead, the question is whether the average person would react in a certain way: with his reason and judgment obscured." (*Id.* at p. 949, last italics added.)

The *Beltran* court further explained that, under the proper standard (which it referred to as the *Logan* standard), "[p]rovocation is adequate only when it would render an ordinary person of average disposition 'liable to act rashly or without due deliberation

---

4       In *Beltran,* during closing arguments at trial, the prosecutor argued in part as follows regarding heat of passion: "'And the provocation has to be such that a person of average disposition to act with passion rather than judgment [*sic*]. We would have probably millions more homicides a year if everyone could use words that may be—although I don't disbelieve. I don't agree that this is what happened. It's an illogical interpretation of the facts. You stub your toe. You're angry, might cuss a few words. *You don't go out and kill somebody.* [¶] We've all gotten cut off in traffic. We say the few choice words, "Oh, my God." *We don't* gun the pedal and start trying to hit the car in front of us to *try to kill the person* who cut us off. Can you imagine if that was permissible, "Oh, my God, I acted [ ] without judgment and rash. I got so angry. I was insulted." That's not the standard. It's a reasonable person, and you're all reasonable people and you know that it's illogical that even these words were uttered.'" (*Beltran, supra,* 56 Cal.4th at p. 943, fn. 5, italics added.) The Supreme Court in *Beltran* commented that the prosecutor's remarks to the jury arguably misstated the law by "seem[ing] to suggest that the jury should consider the ordinary person's conduct and whether such a person would kill." (*Id.* at p. 955 & fn. 15.)

12

and reflection, and from this passion rather than from judgment.'" (*Beltran, supra*, 56 Cal.4th at p. 957, quoting *People v. Logan* (1917) 175 Cal. 45, 49.) The Supreme Court rejected the Attorney General's argument in that case that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. (*Beltran*, at pp. 946, 949.)

Here, the prosecutor misstated the law by essentially arguing, like the prosecutor in *Beltran*, that the proper standard for assessing the adequacy of provocation is whether an ordinary person of average disposition would be moved to kill. By misstating the law, as the parties correctly acknowledge, the prosecutor in this case committed misconduct. (*People v. Boyette* (2002) 29 Cal.4th 381, 435 ["[I]t is misconduct for the prosecutor to misstate the applicable law."].)

However, as the Attorney General correctly points out, Vicary forfeited any claim of prosecutorial misconduct in this case because his trial counsel failed to object to the prosecutor's misstatement of the law. (*People v. Price* (1991) 1 Cal.4th 324, 447 ["To preserve for appeal a claim of prosecutorial misconduct, the defense must make a timely objection at trial and request an admonition; otherwise, the point is reviewable only if an admonition would not have cured the harm caused by the misconduct."].)

Thus, in challenging his first degree attempted murder conviction, Vicary claims instead that his counsel performed deficiently and prejudicially by failing to object to the prosecutor's misstatement of the law. This claim is unavailing.

The law governing Vicary's ineffective-assistance-of-counsel claim is settled. A criminal defendant is constitutionally entitled to effective assistance of counsel. (U.S.

13

Const., 6th Amend.; Cal. Const., art. I, § 15; *Strickland v. Washington* (1984) 466 U.S. 668, 684-685; *People v. Frye* (1998) 18 Cal.4th 894, 979.)  To establish a denial of the right to effective assistance of counsel, a defendant must show (1) his or her counsel's performance was below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced the defendant. (*Strickland*, at pp. 687, 691-692; *Frye*, at p. 979.)  To demonstrate prejudice, a defendant must show a reasonable probability he or she would have received a more favorable result had counsel's performance not been deficient.  (*Strickland*, at pp. 693-694; *Frye*, at p. 979.)  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  (*Strickland*, *supra*, 466 U.S. at p. 694.)

Strickland explained that "[j]udicial scrutiny of counsel's performance must be highly deferential [because] [i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."  (*Strickland*, *supra*, 466 U.S. at p. 689.) *Strickland* also explained that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  (*Ibid.*)

In addition, trial counsel's failure to object is generally a matter of trial tactics as to which reviewing courts will not exercise judicial hindsight.  (*People v. Kelly* (1992) 1 Ca1.4th 495, 520 (*Kelly*), italics added.)  In *Kelly*, the California Supreme Court

14

explained that "'[w]hen a defendant makes an ineffectiveness claim on appeal, the appellate court must look to see if the record contains any explanation for the challenged aspects of representation. If the record sheds no light on why counsel acted or failed to act in the manner challenged, "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation" [citation], the contention must be rejected.'" (*Ibid*.) Thus, "[a] reviewing court will not second-guess trial counsel's reasonable tactical decisions." (*Ibid*.)

"Because the appellate record ordinarily does not show the reasons for defense counsel's actions or omissions, a claim of ineffective assistance of counsel should generally be made in a petition for writ of habeas corpus, rather than on appeal." (*People v. Diaz* (1992) 3 Cal.4th 495, 557-558 (*Diaz*).) A defendant's burden is difficult to carry on direct appeal because reviewing courts will reverse convictions on the ground of inadequate representation only if the record on appeal *affirmatively discloses that counsel had no rational tactical purpose* for his or her act or omission. (*People v. Lucas* (1995) 12 Ca1.4th 415, 43.)

Here, we conclude Vicary has failed to meet his burden of overcoming the strong presumption that his trial counsel's failure to object to the prosecutor's misstatement of the law regarding the proper standard for assessing the adequacy of provocation fell within the wide range of reasonable professional assistance. The appellate record does not disclose the reasons for defense counsel's omission. The Attorney General argues that Vicary's counsel may have decided to withhold an objection because the court had properly instructed the jury under CALCRIM No. 603 (on the lesser included offense of

15

attempted voluntary manslaughter committed in the heat of passion, as a lesser included offense of attempted murder), and counsel was relying on the jurors to follow the court's instructions. Indeed, as already noted, the court had instructed the jurors under CALCRIM No. 222 that the attorneys' statements were not evidence, and also had instructed them under CALCRIM No. 200 that, if they believed the attorneys' comments on the law conflicted with the court's instructions, they were required to follow the court's instructions.

The Attorney General also argues that because defense counsel in his closing argument urged the jury to acquit Vicary of *any* criminal liability for attempted homicide, he may have purposefully decided not to raise an objection in order to avoid placing emphasis on the prosecutor's closing argument.

While the Attorney General's arguments offer plausible explanations for defense counsel's challenged omission, they are speculative, as the Attorney General concedes. The California Supreme Court has directed that, "[w]hen . . . the record sheds no light on why counsel acted or failed to act in the manner challenged, the reviewing court should not speculate as to counsel's reasons [because] engag[ing] in such speculations would involve the reviewing court'" in the perilous process of second-guessing."'" (*Diaz, supra*, 3 Cal.4th at p. 557.) We are bound by the Supreme Court's directive in *Diaz.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Here, as the appellate record sheds no light on why Vicary's trial counsel did not object to the prosecutor's misstatement of the law during closing arguments, we will not speculate as to counsel's reasons. (*Diaz, supra*, 3 Cal.4th at p. 557.) Thus, as the record

16

sheds no light on why counsel failed to act in the manner Vicary challenges, and there is no basis for determining there could be no satisfactory explanation for his omission, we conclude his claim of ineffective assistance of counsel must be rejected because Vicary has failed to meet his threshold burden of demonstrating his trial counsel's performance was deficient.  (See *Kelly*, *supra*, 1 Cal.4th at p. 520.)

b. *Vicary's claim his counsel's performance was prejudicial*

In light of our conclusion that Vicary has failed to meet his burden of demonstrating his counsel provide ineffective assistance by failing to object to the prosecutor's misstatement of the law regarding provocation, we need not reach the merits of Vicary's related assertion he was prejudiced by the claimed ineffective assistance. However, even if we were to assume defense counsel's performance was deficient, we would further conclude Vicary has failed to show he was prejudiced by the ineffective assistance.

In support of his claim of prejudice, Vicary relies on this court's decision in *People v. Anzalone* (2006) 141 Cal.App.4th 380.  Vicary asserts that, "like [in] *Anzalone*, defense counsel's failure to object to the prosecutor's misstatement of the law on the correct standard for provocation . . . allowed the jury to reject attempted voluntary manslaughter on an erroneous legal theory."  Vicary acknowledges that here, "[a]s in *Anzalone*, it was arguably reasonable for defense counsel's closing argument to gloss over attempted voluntary manslaughter since the defense's primary position was [that he] had no intent to kill when he beat and choked [the victim], and that he was only guilty of the charge of domestic violence."  He claims, however, that it is reasonably probable the results of the

trial would have been different if his trial counsel had objected because, "[l]ike [in] *Anzalone*, the prosecutor's closing argument left the jury with the mistaken impression that only provocation that inflamed an ordinary man to kill reduced attempted murder to attempted voluntary manslaughter, and thus, it lessened the prosecutor's burden of proof by allowing the jury to improperly reject attempted voluntary manslaughter as a lesser included offense."  Vicary's reliance on *Anzalone* is unavailing.

In *Anzalone*, the defendant was convicted of four counts of first degree attempted murder based on evidence that the owner of a car interrupted the defendant as he was attempting to steal the car, and the defendant fled but soon thereafter drove by and fired two gunshots, one at the owner and the other in the direction of three other men who were with the owner and attempting to find cover by the trunk of the car.  (*Anzalone*, *supra*, 141 Cal.App.4th at p. 384.)  On appeal the defendant challenged three of his four attempted murder convictions, contending the court erred by failing to give a standard jury instruction on concurrent intent, and defense counsel provided ineffective assistance by failing to object to the prosecutor's misstatement of the law on the concepts of concurrent intent and "zone of danger."  (*Id*. at pp. 386, 395-396.)

In reversing the three attempted murder convictions related to the second gunshot the defendant fired in the direction of the three men by the trunk of the car, we concluded in *Anzalone* that, although the court did not commit instructional error, the prosecutor committed misconduct by misstating the law related to the concepts of concurrent intent

18

and zone of danger.[5] (*Anzalone*, *supra*, 141 Cal.App.4th at pp. 392-393, 395.) We also held defense counsel "was prejudicially ineffective in failing to object to the prosecutor's misstatement of the law." (*Id*. at p. 395.) In reaching this conclusion, we reasoned that (1) as the trial court had not instructed the jury on the concept of concurrent intent (see *id*. at p. 390), the prosecutor's erroneous argument concerning zone of danger "left the jury with the mistaken impression that by firing indiscriminately in the direction of a group of men, [the defendant] was guilty of attempting to kill them all" (*id.* at p. 395); (2) it was

---

[5]     Specifically, we concluded in *Anzalone* that "the argument of the prosecutor concerning how the jury could find appellant guilty of four counts of attempted murder when only two shots were fired was legally incorrect. [¶] It appears the prosecutor was attempting to invoke in some form the concept of concurrent intent outlined in [*People v. Bland* (2002) 28 Cal.4th 313] to explain how four counts of attempted murder could arise from the firing of only two shots. Undoubtedly, the trial court was aware this was the prosecutor's theory. . . . The trial court, however, did not give CALJIC No. 8.66.1, defining the concept of concurrent intent. [W]e cannot be sure why the trial court did not so instruct but it may be because in *Bland* the court explained that concurrent intent is not a legal doctrine requiring special instructions. The concept is, simply, an inference the jury may draw from the evidence." (*Anzalone*, *supra,* 141 Cal.App.4th at p. 392.) We noted that the prosecutor "told the jury that two shots could amount to four attempted murders because of 'something called the zone of danger,'" and he "explained that anytime persons are within this zone, the indiscriminate firing of a shot at those persons amounts to an attempted murder of everyone in the group." (*Ibid*.)

    Concluding that the prosecutor "misstated the law relevant to the definition of attempted murder" (*Anzalone, supra,* 141 Cal.App.4th at p. 393), we explained that "[t]he prosecutor's argument concerning zone of danger was erroneous and misleading" (*ibid.*) because, "[c]ontrary to the prosecutor's argument, an attempted murder is not committed as to all persons in a group simply because a gunshot is fired indiscriminately at them. The prosecutor's argument incorrectly suggest[ed] that a defendant may be found guilty of the attempted murder of someone he [did] not intend to kill simply because the victim is in some undefined zone of danger. In fact, to be found guilty of attempted murder, the defendant must either have intended to kill a particular individual or individuals or the nature of his attack must be such that it is reasonable to infer that the defendant intended to kill everyone in a particular location as the means to some other end, e.g., killing some particular person." (*Id.* at pp. 392-393.)

19

reasonably probable the prosecutor's misstatement of the law "led the jury to convict [the defendant] of three additional counts of attempted murder merely because the remaining victims were in some 'zone of danger'" (*id.* at p. 396); and, thus, (3) there was a reasonable probability the results of the trial proceeding would have been different had defense counsel objected because his failure to object "allowed the jury to find [the defendant] guilty of multiple counts of attempted murder on an erroneous legal theory." (*Id.* at p. 395.)

Vicary's reliance on *Anzalone* is unavailing because that case is distinguishable. In *Anzalone*, as already discussed, defense counsel's failure to object to the prosecutor's misstatement of the law regarding the concepts of concurrent intent and zone of danger was prejudicial because the trial court did not instruct the jury concerning those legal concepts; and, thus, counsel's failure to object allowed the jury to convict the defendant of multiple counts of attempted murder on an erroneous legal theory. (*Anzalone*, *supra*, 141 Cal.App.4th at pp. 395-396.) Here, however, the trial court properly instructed the jury under CALCRIM No. 603 on the law concerning the essential concept at issue here—the legal standard for assessing the sufficiency of provocation that reduces an attempted murder to attempted voluntary manslaughter committed in the heat of passion. As already noted, the court also instructed the jury under CALCRIM No. 200 that, if they believed the attorneys' comments on the law conflicted with the court's instructions, they were required to follow the court's instructions. Absent a showing to the contrary, we assume the jury understood and followed the instructions given. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17 ["The crucial assumption underlying our constitutional

system of trial by jury is that jurors generally understand and faithfully follow instructions."].)  Here, as there is no showing to the contrary, we assume the jury understood and followed the instructions the court properly gave under CALCRIM No. 603.  (*Mickey*, at p. 689, fn. 17.)  Thus, Vicary's reliance on *Anzalone* to show prejudice is unavailing.

In any event, in light of the overwhelming evidence supporting his first degree attempted murder conviction (discussed, *ante*, in the factual background), Vicary's claim that—but for his counsel's failure to object—he would have obtained a more favorable outcome, fails.  That evidence shows Vicary choked the victim to the point of rendering her unconscious, injuring her throat, and causing the blood vessels in her eyes to burst. The strongly incriminating evidence showing Vicary let go of her throat, stated "[s]he was going to leave me," and immediately fled when a witness screamed at him, supported a finding he acted with willful premeditation and was aware of his guilt.  For all of the foregoing reasons, we conclude Vicary has failed to meet his burden of showing prejudicial ineffective assistance of counsel.

2. *Claim that the prosecutor's misstatement of the law caused prejudicial jury confusion*

Vicary also claims the prosecutor's misstatement of the standard for assessing provocation injected ambiguity into the attempted voluntary manslaughter instruction the court gave the jury under CALCRIM No. 603 (see fn. 3, ante), thereby prejudicing him by causing jury confusion that resulted in a miscarriage of justice.  We conclude this claim is unavailing because Vicary has failed to meet his threshold burden of

21

demonstrating the prosecutor's misstatement of the law caused jury confusion, and, in any event, he has failed to demonstrate prejudice.

Our analysis is guided by the California Supreme Court's decision in *Beltran, supra*, 56 Cal.4th 935. There, the defendant was charged with the murder of his former girlfriend. (*Id*. at pp. 939, 941.) The trial court instructed the jury on the lesser included offense of attempted voluntary manslaughter committed in the heat of passion by using a modified version of former CALCRlM No. 570, which stated in part:

> "The defendant killed someone . . . in the heat of passion if . . . , as a result of provocation, the defendant acted rashly and under the influence of intense emotion that obscured his reasoning or judgment; and . . . the provocation would have caused a person of average disposition to act rashly and without due deliberation. That is, from passion rather than from judgment." (*Beltran, supra*, 56 Cal.4th at p. 944.)

During closing argument, the prosecutor indicated that, to find the defendant acted in the heat of passion, the jury would have to find that a person of average disposition in the defendant's position would "go out and kill somebody." (*Beltran, supra*, 56 Cal.4th at p. 943, fn. 5.) Defense counsel responded by arguing that the prosecutor had misstated the law, and that the standard for assessing the adequacy of provocation was whether "[t]he provocation would have caused a person of average disposition to act rashly and without due deliberation." (*Id*. at p. 944, fn. 4.)

During deliberations, the jury sent the following note to the court:

> "'In instruction 570: 'In deciding whether the provocation was sufficient, consider whether a person of average disposition would have been provoked and how such a person would react in the same situation knowing the same facts.' Does this mean to commit the

22

same crime (homicide) or can it be other, less severe, rash acts [?]'" (*Beltran*, *supra*, 56 Cal.4th at p. 945.)

After consulting counsel, the trial court provided the following response to the jury's note:

> "'The provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion that his judgment or reasoning process was obscured. This is an objective test and not a subjective test.'" (*Beltran*, *supra*, 56 Cal.4th at p. 945, fn. omitted.)

The jury thereafter convicted the defendant of second degree murder. (*Beltran*, *supra*, 56 Cal.4th at p. 941.) In a split decision, the Court of Appeal reversed the conviction, with the majority concluding the parties' closing arguments created an ambiguity in the trial court's jury instruction on provocation that was highlighted by the jury's note and was prejudicial to the defendant. (*Id*. at pp. 945, 955.)

The California Supreme Court disagreed and upheld the defendant's murder conviction. (*Beltran*, *supra*, 56 Cal.4th at pp. 955, 958.) The *Beltran* court concluded that the parties' closing arguments had "muddied the waters" and their "competing formulations" of heat of passion "may have confused the jury's understanding" of the court's instruction on provocation. (*Id*. at pp. 954-955.) However, notwithstanding the jury's note indicating possible confusion, the Supreme Court rejected the defendant's claim that the ambiguity introduced into the instructions deprived him of his federal constitutional rights to a jury trial and due process. (*Id*. at p. 955.) Applying the

23

harmless error standard announced in *People v. Watson* (1956) 46 Cal.2d 818, 836,[6] the Supreme Court concluded "[i]t was not reasonably probable that the jury here was misled to defendant's detriment." (*Beltran*, at p. 956.) The Supreme Court reasoned that, "[a]lthough counsel's argument may have created ambiguity about the nature of sufficient provocation, the jury directly requested clarification of the standard," and "[t]he trial court responded with a correct statement of law, that '[t]he provocation involved must be such as to cause a person of average disposition in the same situation and knowing the same facts to do an act rashly and under the influence of such intense emotion that his judgment or reasoning process was obscured." (*Ibid.*, italics omitted.) The *Beltran* court also stated that "[t]his instruction properly focused upon the *rashness* of the act, not on the act alone." (*Id.* at p. 957.)

Here, Vicary has failed to meet his threshold burden of demonstrating the prosecutor's misstatement of the law regarding provocation caused any possible jury confusion. As the Attorney General correctly points out, unlike in *Beltran* where the jury's note indicated possible jury confusion, nothing in the record here indicates possible jury confusion.

Even if Vicary had demonstrated possible jury confusion, he has failed to meet his burden of demonstrating prejudice. Applying the *Watson* harmless error standard, as we must (*Beltran*, *supra*, 56 Cal.4th at p. 956), we conclude Vicary has failed to show a

---

6     The Supreme Court explained that, "'[u]nder *Watson*, a defendant must show it is reasonably probable a more favorable result would have been obtained absent the error.'" (*Beltran*, *supra*, 56 Cal.4th at p. 955, quoting *People v. Mena* (2012) 54 Cal.4th 146, 162.)

reasonable probability the jury was misled to his detriment by the prosecutor's misstatement of the law regarding provocation. The trial court correctly instructed the jury in part under CALCRIM No. 603 that "[t]he defendant attempted to kill someone . . . in the heat of passion if: [¶] . . . [¶] . . . the provocation would have caused a person of average disposition to act rashly and without due deliberation; that is, from passion rather than from judgment." Significantly, as already discussed, the court also instructed the jury under CALCRIM No. 200 that, if they believed the attorneys' comments on the law conflicted with the court's instructions, they were required to follow the court's instructions.

Absent a showing to the contrary, we assume the jury understood and followed the instructions given. (*People v. Mickey*, *supra*, 54 Cal.3d at p. 689, fn. 17.) Thus, as there is no showing to the contrary here, we assume the jury understood and followed the instructions the court properly gave under CALCRIM No. 603. (*Mickey*, at p. 689, fn. 17.) We conclude Vicary has failed to demonstrate the prosecutor's misstatement of the law regarding provocation resulted in a miscarriage of justice.

For all of the foregoing reasons, we affirm the judgment.

DISPOSITION

The judgment is affirmed.

                                                    _____
                                                                    NARES, J.

WE CONCUR:


_____
            McCONNELL, P. J.


_____
            IRION, J.